**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Douglas Ray HARRELL,**
**Defendant–Appellant.**

No. 89–1273.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1990.

Rehearing Denied March 1, 1990.

Richard A. Henderson, Ft. Worth, Tex. (court appointed), for defendant-appellant.

Delonia A. Watson, Asst. U.S. Atty., Dallas, Tex., Frederick Schattman, and Marvin Collins, U.S. Attys., Fort Worth, Tex., for plaintiff-appellee.

Before HIGGINBOTHAM, SMITH, and DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendant Douglas Ray Harrell challenges his conviction for aiding and abetting two Mexican nationals in falsely representing themselves to be United States citizens before immigration officials. Concluding (1) that relevant portions of the government interrogations were "noncustodial" in nature and do not raise *Miranda* concerns; (2) that the evidence was legally sufficient to sustain a conviction under 18 U.S.C. §§ 911 and 2; and (3) that section 911 does not require the government to disprove every possibility that those accused thereunder are naturalized United States citizens, we affirm.

## I.

Harrell had given two Mexican citizens a copy of the same Texas birth certificate, belonging to a decedent known as "Anthony Ramirez," and directed them to fly to Dallas from Mexico City on separate flights. Immigration and Naturalization Service (INS) inspectors stopped the first Mexican to arrive, Jorge Posada–Alvarez (Alvarez), at an airport immigration checkpoint designated for United States citizens only. Alvarez presented the inspectors

with the "Anthony Ramirez" birth certificate, represented himself to be a United States citizen, and offered Harrell's Texas address as his then-current residence.

INS officials became suspicious of Alvarez who, despite the Texas birth certificate, spoke little English. Upon further questioning, Alvarez admitted that the birth certificate was false, that it had been provided to him by Harrell, and that Harrell would be arriving in Dallas on a later flight that day from Mexico City. INS inspectors stopped Harrell hours later at the immigration checkpoint upon his arrival, fitting the physical description given by Alvarez and accompanied by Anastacio Alvarez–Duran (Duran).

Duran also represented himself to be a United States citizen and presented the same "Anthony Ramirez" birth certificate to INS inspectors. Upon further questioning, Duran informed INS that Harrell had supplied him with false documentation in order to gain entry into the United States so that he could work thereafter for Harrell.

Harrell was informed by INS agents that he was being detained pursuant to an investigation regarding the importation of illegal aliens. He was taken to an adjacent INS office separated from the public by a series of glass walls and interior conference areas. There, near the beginning of the interrogation, Harrell informed the agents that he indeed had supplied the aliens with false documentation for purposes of illegal entry into the United States. Several agents interviewed Harrell, detaining him for approximately 60–75 minutes before releasing him; no INS agent, however, provided Harrell with *Miranda* warnings.

Several days after the airport detention, INS special agent Kulasxa questioned Harrell at the defendant's home. Kulasxa testified that before questioning, he "tended to give [Harrell] the classic *Miranda* warnings." However, the agent erroneously instructed Harrell that if the matter proceeded *to trial,* an attorney would be furnished if he could not afford one. There, the

defendant once again admitted to supplying false documentation to the illegal aliens.

The matter did proceed to trial, and the principal witnesses against the defendant were Alvarez, Duran, and Kulasxa. A motion to suppress Harrell's confession was denied. Kulasxa proceeded to testify only as to Harrell's incriminating remarks offered during those early moments of the airport detention and during the home interrogation days later.

Alvarez and Duran testified that the defendant had furnished each of them with false birth certificates and had offered assistance in gaining entry into the United States. They also testified that they were Mexican citizens. The government, however, never asked whether they were naturalized citizens of the United States, an oversight, the defendant argues, of great significance. Harrell was convicted and sentenced.

Harrell unsuccessfully moved for an acquittal based upon the ground that the evidence was insufficient to sustain a conviction; to his understanding, the law presumes that Alvarez and Duran were naturalized citizens at the moment they tried to gain entry into the United States. Since the government did not rebut such a presumption, Harrell asserts, it has not proved every necessary element of section 911 beyond a reasonable doubt, and his conviction as an accessory, therefore, should be reversed.

On appeal, Harrell renews his argument that his conviction pursuant to sections 911 and 2 must be reversed because the government failed in carrying its "negative burden" of disproving that Alvarez and Duran were naturalized citizens. He also argues that any incriminating information supplied to INS before he was read his *Miranda* warnings, or the fruits of such information, should have been suppressed at trial.

## II.

The question of whether *Miranda's* guarantees have been impermissibly denied to a criminal defendant, assuming the facts as established by the trial court are not

clearly erroneous, is a matter of constitutional law, meriting *de novo* review. *See United States v. Torkington,* 874 F.2d 1441, 1445 (11th Cir.1989); *United States v. Brady,* 819 F.2d 884, 886 (9th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). If that independent review demonstrates that *Miranda* has not been respected, and that statements admitted at trial have been elicited from the defendant without adequate precautions, reversal is not *automatic,* as such unforewarned statements may have been harmless. *See Harryman v. Estelle,* 616 F.2d 870, 875 (5th Cir.) (en banc), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980).

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that statements made by a defendant in the course of a "custodial interrogation" are not admissible unless certain procedural safeguards (warnings) are respected. Since Harrell was not given any *Miranda* warnings by INS agents at the airport, his statements are admissible only if the questioning was not a "custodial interrogation."

The test for "custodial interrogation" adopted by this circuit is articulated in *United States v. Bengivenga,* 845 F.2d 593 (5th Cir.) (en banc), *cert. denied,* ── U.S. ────, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988):

> The meaning of custody has been refined so 'the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with formal arrest.' The Supreme Court has also explained that 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation.' A suspect is therefore 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.

*Id.* at 596 (citations omitted). *See also Berkemer v. McCarty,* 468 U.S. 420, 440–

41, 104 S.Ct. 3138, 3150–51, 82 L.Ed.2d 317 (1984).

In *Bengivenga,* border patrol agents stopped a bus at a routine citizenship checkpoint and asked two passengers purporting to travel to Alice, Texas, to enter an adjoining trailer for questioning concerning suspected marijuana in some passenger luggage similarly destined for Alice. The agents asked the two detainees for their bus tickets, whereupon it was determined that the baggage-claim tickets matched the luggage containing the suspected drugs. The detainees were given *Miranda* warnings and then arrested. The pre-arrest interrogation took at most 90 seconds.

In upholding the convictions, the en banc court focused upon several factors in determining that the pre-arrest questioning was noncustodial in nature. First, the court noted the short interrogation in that case, recognizing that brief stops mitigate against a belief that an "arrest" has occurred. *Id.* at 598. *See also Berkemer,* 468 U.S. at 437, 104 S.Ct. at 3148. Second, the court reasoned that the interrogation took place in a public environment that would not lead a reasonable person to believe that he was under formal arrest:

> Several factors counteract the effect that moving a suspect from a bus to a building maintained by law enforcement personnel would ordinarily have on a reasonable person's perception of the situation and the degree of restraint imposed. First, the trailer was only a short distance from the bus. Second, the conduct of the agents remained subject to the public scrutiny to the extent that the bus driver was actually present in the trailer drinking coffee. The agents did not completely isolate the [passengers] in an interrogation room. Third, the number of agents did not increase. Only five people were present in the trailer—the bus driver, the two women and the two agents.

845 F.2d at 599–600.

Third, the court noted that the fact of a "fixed checkpoint" interrogation, such as immigration screening, mitigates the sub-

jective fear a *reasonable person* would otherwise experience. *Id.* at 599. That is, immigration checkpoints do not take travelers "by surprise" and, in fact, the "law enforcement presence at a fixed checkpoint actually assuages the reasonable person's perception of restraint." *Id.* The court reasoned,

> Routine citizenship checks at fixed checkpoints do not impose a degree of restraint associated with arrest because the detention is by nature brief and subject to the scrutiny of other travelers, the intrusion is limited in scope, advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint.

*Id.*

The record in this case establishes that Harrell was interrogated in a room separated from the public by glass enclosures and was not accused of any crime so as to heighten the apprehension inherent in the situation. He was questioned by several INS agents for over an hour and then released. Any evidence adduced at trial adverse to Harrell was elicited only a few moments into the interrogation. Further, he testified that although he did not feel able to leave, he discerned that he would not be detained for a long period of time.

■ We do not believe that the investigatorial questioning by agents during those first few minutes at the immigration checkpoint can be fairly described as a "custodial interrogation."[1] First of all, *Bengivenga* recognized that immigration detentions are typically not the equivalent of formal arrests; among other things, advance notice, public scrutiny, and limited intrusion distinguish such stops. Further, Harrell's subjective sensations during the immigration detention by INS are irrelevant, because we are concerned with what a "reasonable person" would understand in this factual situation. That is, the constitu-

tionality of the detention does not turn upon the sensitivity, or lack thereof, of the person being interrogated. *Id.* at 596.

Moreover, the interrogation took place behind a glass wall adjoining the airport's immigration checkpoint. As recognized in *Bengivenga*, the immigration interrogation may take place a slight distance away from the checkpoint in order to spare the detainee public embarrassment and to keep traffic moving.

In addition, we cannot say that a 60–75 minute interrogation is *per se* custodial, especially where the detainee offers the incriminating statements early in the detention. Some measure of investigatorial questioning is permissible without invoking *Miranda* concerns. No authority is cited to support Harrell's assertion that a sixty-minute immigration interrogation, as a matter of law, requires *Miranda* warnings to precede it. That is, remarks offered moments into the interrogation are not necessarily "poisoned" because a court decides in hindsight that a "lengthy" detention effectively relates back to shield *all* adverse remarks.

It is true that interrogations in excess of an hour may, in appropriate circumstances, require *Miranda* warnings, and that certain statements elicited incident to lengthy detentions may have to be suppressed. However, in *Bengivenga* we set no constitutional time limit for authorities to question a detainee before triggering *Miranda*. We must consider other factors, such as the point when the detainee offers the incriminating remarks, the place of the interrogation, the public nature of the detention, and the number of police interrogators. *Bengivenga* instructs that short detentions assuage a reasonable person's fear that his freedom of movement is impinged to a degree which the law associates with formal arrest.

---

**1.** We agree with the defendant that a detention of approximately an hour raises considerable suspicion. We note, however, that neither the agents nor the detainee accurately knows in advance his expected delay. Overreliance upon the length of the delay thus injects a measure of hindsight into the analysis which we wish to avoid. Accordingly, we reject the broad proposition that a short delay constitutes *per se* a noncustodial interrogation or that an hour-long delay constitutes a *per se* custodial interrogation. It is but one, albeit important, factor to consider in applying our objective standard outlined in *Bengivenga*.

Concluding that the statements at issue here were offered minutes into the questioning at the airport, that Harrell was not told that he was suspected of any crime, that he was detained in close proximity to the immigration checkpoint, that he was questioned in a glass conference area with few officials present, and that he suffered no physical restraints comparable to formal arrest, we believe no "custodial" interrogation took place. Accordingly, INS agents were not *constitutionally* required, under the facts herein presented, to preface their questioning with *Miranda* warnings. Information supplied early into the detention, and thereafter admitted into evidence, was not thereby poisoned.

In light of our conclusion that the relevant portion of the airport interrogation was noncustodial, the constitutionality of the second "home interrogation" is easily resolved. Harrell argues that since his rights were violated at the airport, the statements which he later made at his home must also be suppressed under the "fruit of the poisonous tree" doctrine. Harrell, however, misconstrues the poisonous-tree doctrine, as it does not extend to *Miranda* violations. *See Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) (*Miranda* requires only that unwarned statements, not subsequent statements knowingly and voluntarily made, be suppressed); *Bengivenga,* 845 F.2d at 601. The doctrine operates only where constitutional violations arise, and *Miranda's* prophylactic warnings are not constitutional rights in and of themselves. *Elstad,* 470 U.S. at 305, 105 S.Ct. at 1290 (quoting *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984)).

In addition to the poisonous-tree argument, Harrell separately challenges the admissibility of testimonial remarks made by him at his home as being at odds with *Miranda.* It is evident from the record, however, that INS agent Kulasxa gave Harrell his *Miranda* warnings before questioning took place at the defendant's home. Kulasxa testified that he "tended" to give the classic *Miranda* warnings. Harrell, however, contends that the warnings were insufficient because Kulasxa also stated that *if the matter went to trial* an attorney would be furnished to him if he could not afford one.

The addition of an erroneous statement does not vitiate an otherwise correct *Miranda* warning. The test of whether *Miranda* has been satisfied is whether the warning reasonably conveys to a suspect his rights. *Duckworth v. Eagan,* —— U.S. ——, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989). In *Duckworth,* the Court scrutinized a warning that met *Miranda's* basic formula but added, "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." *Id.* at 2877 (emphasis omitted).

The Court held that the superfluous language did not render an otherwise valid warning defective. That is, there is no one singularly correct form of *Miranda. Id.* at 2879. As long as agent Kulasxa's warning reasonably conveyed to Harrell his *Miranda* rights, which we believe to be the case, the addition of this erroneous statement does not require suppression of his remarks.

Nevertheless, assuming Kulasxa's *Miranda* warning fell short of the Constitution's minimum standard, as Harrell suggests, there is still no reversible error here: The home interrogation was noncustodial and thus did not require *Miranda* protection. A reasonable person, questioned within his own home, would not suffer "a restraint on freedom of movement of the degree which the law associates with formal arrest." This is especially true where, as here, agent Kulasxa announced that he would leave at any time upon request by Harrell.

In conclusion, relevant portions of the airport detention and the entire home interrogation were noncustodial in nature. That being so, INS agents were not required immediately to instruct Harrell pursuant to *Miranda* at the immigration checkpoint for purposes of presenting adverse testimonial evidence to the jury.

### III.

Harrell maintains that his conviction pursuant to 18 U.S.C. §§ 911 and 2 is legally defective because, to violate these criminal provisions, one must be a *noncitizen* who falsely represents himself to be a citizen of the United States. In this case, the argument proceeds, the government failed to prove that Alvarez and Duran were not United States citizens at the moment that they tried to enter the country. Harrell cites *Colt v. United States*, 158 F.2d 641 (5th Cir.1946), for the proposition that the evidence presented by the government in the instant case is insufficient to satisfy essential elements of the crime.

In *Colt*, a Rumanian-born defendant had been living in the United States for at least nineteen years prior to committing the alleged criminal act of registering to vote in Florida and thereby claiming to be a United States citizen. He maintained that, having lived in the United States since the age of four, he was a naturalized citizen. The defendant was convicted under the predecessor to section 911.[2]

Reversing Colt's conviction for insufficiency of the evidence, the court was troubled by the government's failure to disprove naturalization, an entirely reasonable possibility under the facts therein presented:

> The trouble here is that there are no circumstances which fairly indicate that Colt has never been naturalized. According to the Fourteenth Amendment one may be a citizen of the United States either by being born subject to the jurisdiction thereof, or by being naturalized. To show by his own admissions or otherwise that Colt was born in Romania some forty years ago fairly shows that he was not born a citizen of the United States ..., but it falls short of showing that he

has not since been naturalized.... There is no admission from him that he was not then a citizen and we have his sworn statements that he was [a citizen].

*Id.* at 642. Harrell argues that *Colt* stands for two propositions. First, section 911 requires that there be a false representation of United States citizenship. Second, to prove that the representation is false, Harrell asserts that the government must negate the twin possibilities that the individual who allegedly makes the false representation is *neither* a natural-born *nor* a naturalized citizen.

We decline to read *Colt* as broadly as the defendant would have us. In *Colt*, the defendant lived most of his life in the United States and, significantly, maintained that he was indeed naturalized. In this case, Alvarez and Duran were trying to gain initial entry into the United States, and neither individual claimed to have been naturalized. *Colt*, properly construed, requires the government to offer sufficient evidence from which a rational juror can draw the inference that the person in question was neither natural-born nor naturalized.

The government proved in the instant case that Alvarez and Duran were Mexican citizens by birth and that they presented false birth certificates as evidence of their purported citizenship. Since this evidence does not technically negate the possibility that they were dual United States–Mexican nationals upon entry, Harrell believes that the evidence is insufficient. Harrell argues that the government needed to establish the parentage of both Mexicans, a task not accomplished here; in other words, he asserts that to establish that one is a Mexican-born citizen is not enough, because one may *unknowingly* be naturalized if born of parents with United States citizenship.

---

**2.** Colt was convicted for violating 8 U.S.C. § 746(a)(18) (1940), which made it, at that time, a felony for a person "knowingly to falsely represent himself to be a citizen of the United States without having been naturalized or admitted to citizenship, and without otherwise being a citizen of the United States." *See* 158 F.2d at 641. Section 746(a)(18) has been replaced by 18 U.S.C. § 911, which makes it a crime if one "falsely and willfully represents himself to be a citizen of the United States." The revision notes

to § 911 state that the only significant change made to § 746(a)(18) was substituting "willfully" for "knowingly" and that the remaining changes were "minor" and "unnecessary words were omitted." Thus, the only change in the statute, insofar as the elements needed to obtain a conviction are concerned, is the change in the *mens rea* requirement. Since *mens rea* plays no part in the instant case, *Colt's* interpretation of § 746(a)(18) remains relevant to our understanding of § 911.

We conclude that Harrell's argument is untenable. He correctly argues that *Colt* is still good law insofar as the government must prove that neither Alvarez nor Duran was a United States citizen upon attempted entry. However, Harrell is incorrect in asserting that *Colt* creates a presumption of naturalization under section 911. As we have noted, *supra*, the question is whether, under the facts and circumstances of the case, a rational juror could have concluded that Alvarez and Duran were not American citizens.

Moreover, when *Colt* was decided in 1946, the standard for the sufficiency of the evidence for conviction was different from that today. Then, when the government relied upon circumstantial evidence, it had to negate every reasonable hypothesis of innocence. *See United States v. Bell*, 678 F.2d 547, 549 n. 3 (5th Cir. Unit B 1982), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); 2 C. Wright, *Federal Practice and Procedure* § 467 (2d ed.1982).

The present standard differs substantively:

> The evidence ... must, of course, be viewed in a light that is most favorable to the Government, with all reasonable inferences and credibility choices made in support of the jury's verdict. The standard is the same whether the evidence is direct or circumstantial.... After viewing the cold and impersonal record in the light most favorable to the Government, we must affirm if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' This is so because a jury may choose its verdict among reasonable constructions of the evidence so long as the evidence establishes guilt beyond a reasonable doubt.

*United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir.1987) (citations omitted), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). *See also United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1989); *Bell*, 678 F.2d at 549. Thus, relevant circumstantial and direct evidence now are equally admissible for purposes of establishing guilt. *See Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954) (circumstantial evidence is intrinsically no different from direct evidence).

Further, the government need not discredit every possibility that the Mexicans were naturalized citizens of the United States. It need only demonstrate, beyond a reasonable doubt, that Alvarez and Duran were not United States citizens at the time when they represented themselves to be. That obligation may be achieved entirely with direct or circumstantial evidence, or a combination of both.

In this case, this burden was accomplished by circumstantial evidence showing that Alvarez and Duran were born in Mexico and that they offered false birth certificates under the name of "Anthony Ramirez." The trier of fact was entitled to conclude beyond a reasonable doubt that the Mexicans were not naturalized citizens, especially since they never maintained that they were indeed naturalized. Concluding that sufficient evidence was adduced at trial to convince a jury, beyond a reasonable doubt, that Alvarez and Duran were noncitizens at the moment they tried to gain entry into the United States, and that no *Miranda* violations occurred requiring the suppression of adverse statements, we AFFIRM.