# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20533

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

CHARLES WRIGHT,

Defendant – Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

February 3, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and JONES and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Defendant-Appellant Charles Wright was indicted, tried, and found guilty of distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B) and (b)(1), and possessing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) and 2256(8)(A). He was subsequently sentenced to 240 months imprisonment and a lifetime of supervised release. He timely appealed both his conviction and sentence. For the reasons stated below, we AFFIRM Wright's conviction and sentence.

No. 13-20533

**I.**

On September 14, 2011, at around 7:00 a.m., state and federal law enforcement officers executed a search warrant of Wright's home. Officer John Barnes of the Houston Police Department, who had been assigned to the Houston Child Exploitation Task Force, obtained the search warrant after his investigation revealed that an IP address registered to Wright appeared to be sharing child pornography through a file sharing network. The officers who executed the search warrant were all wearing bulletproof vests and/or raid jackets and were all armed. Six officers were on the "entry team" and had their guns drawn as they entered the residence, while six officers were on the "perimeter team" and were tasked with ensuring that no one left the perimeter without permission from law enforcement. The officers knocked and announced and then entered and cleared the house, which had seven occupants in it. Some of the occupants, including Wright, were wearing nightgowns and pajamas when they were forced to exit the residence.

As the search of the residence was taking place, Officer Barnes approached Wright and told him that he wanted to talk to him. Officer Barnes escorted Wright to his bedroom so that he could change into more appropriate clothing. Wright testified that Officer Barnes grabbed him by the back of his arm to escort him, but Officer Barnes testified that he did not remember ever touching Wright. There were three officers in Wright's bedroom as he got dressed. After Wright got dressed, Officer Barnes escorted him to an unmarked Ford Taurus—Officer Barnes's patrol unit—which was parked next to the parking lot of a neighboring church, about thirty feet from the house. While walking to the car, Officer Barnes told Wright that he was not under arrest and that he was free to leave at any time. Officer Barnes led Wright to the front door of the car, and Wright sat in the front passenger seat and closed

the door.  Agent Guerra sat in the back seat of the car, and Officer Barnes sat in the driver's seat.  Officer Barnes put a recorder on and started the interview.

The interview lasted one hour and two minutes.  At the beginning of the interview, Officer Barnes showed Wright a copy of the search warrant, which Wright said that he could not see without his glasses.  Office Barnes for a second time told Wright that he was not under arrest and that he was free to leave.  Officer Barnes then read Wright his *Miranda* rights, explained to him the nature of the investigation, and proceeded to ask him questions.  Three times during the course of the recorded interview, Wright mentioned the possibility of talking to a lawyer.  Each of the three references was made in response to Officer Barnes's questions regarding Wright's use of ages as search terms when searching for pornography.  The first reference was made shortly after the interview commenced when the following exchange took place:

> JB [Officer Barnes]: [] what about ages, you ever put in ages in search terms?
>
> CW [Wright]: Sometimes.
>
> JB:    What ages do you put in?
>
> CW:   Front, well.
>
> JB:    Do you ever put in 12 year old [].
>
> CW:   We're, we're getting into somethin'.
>
> JB:    Or 14 year old?
>
> CW:   [unintelligible] I probably should talk to that lawyer first yea.

Office Barnes did not address Wright's reference to a lawyer, but instead responded by slightly changing the subject.  Shortly after this first exchange,

3

No. 13-20533

Officer Barnes returned to the topic of ages, and the following exchange took place:

> JB:    What ages do you put in[]there?
>
> CW:  I, that's what I say again, we're getting into [simultaneous conversation] where I should talk to a lawyer.
>
> JB:    [] ok, we'll, oh, oh, only uh, only talk to me about stuff that you wanna talk about.
>
> CW:  Yea, that's what I'm sayin'.
>
> JB:    Ok, so I, I don't wanna, I don't want you to tell me anything you don't want to, but I wanna help you at the same time, being cooperative.
>
> CW:  I'll be, but I don't wanna say anything, again, that's gonna get me in trouble either.

Finally, on a third occasion when Officer Barnes returned to the subject of search terms, Wright responded: "There again, we're gettin' towards the lawyer."

During the course of the lengthy interview, Wright made numerous incriminating statements.  Wright told Officer Barnes about his use of the program Frost Wire to download music, videos, and pictures.  He stated that he used Frost Wire to search for adult pornography, but he freely admitted to using the search term "pedophilia" as well as "PTHC"—an acronym commonly used to search for child pornography.[1]  Wright admitted that when he used those terms he would get 50% child pornography and 50% adult pornography as a result, but he claimed that he would delete the child pornography as soon

---

[1] Officer Barnes testified at trial that "PTHC" stands for "preteen hardcore."

4

as he got it.  Wright told Officer Barnes about his use of an "internet washer" that was supposed to do an "FBI wipe" of his computer to delete files that he did not want.  He explained that he would delete files containing child pornography because he knew they were illegal.  Wright discussed his knowledge, or purported lack of knowledge, regarding the Frost Wire file-sharing feature.  He also stated "you see the kid stuff and, and you know, it's, it's, like drugs."

The interview and, specifically, Wright's references to a lawyer are the subject of two of Wright's three issues on appeal.  First, Wright argues that the district court erred when it denied his motion to suppress the statements that he made to Officer Barnes during the interview.  Second, Wright contends that the government violated *Doyle v. Ohio*, 426 U.S. 610 (1976), when, during its closing argument, the prosecutor commented on Wright's reluctance to answer certain questions during the interview.  Third, Wright argues that at sentencing the district court violated Federal Rule of Criminal Procedure 32 when it refused to allow defense counsel to respond after the government attorney made her sentencing presentation.  We will discuss each issue in turn.

## II.

Before trial, Wright moved to suppress "any statements made to law enforcement officers."  Wright argued that he properly, and unambiguously, invoked his Fifth Amendment right to counsel and that Officer Barnes violated that right when he continued to ask questions.  The district court held a suppression hearing during which it heard testimony from four witnesses—Officer Barnes, two FBI Special Agents who participated in the search of Wright's house, and Wright.  The district court denied Wright's motion to suppress.  The district court concluded that Wright's statements should not be suppressed because Wright was not "under arrest at the time that he spoke

with the interrogating officer"[2] and because Wright "never requested the presence of an attorney." Order on Motion to Suppress at 3, *United States v. Wright*, No. 12-91 (S.D. Tex. Jan. 28, 2013), ECF No. 61 (citation omitted) (finding that Wright "was not in handcuffs and had the freedom to remove himself from the vehicle where the questioning was ongoing" and that he "was permitted to enter his home, even during the search, to obtain additional clothing").

## A.

"When the district court denies a motion to suppress, we review factual findings for clear error and conclusions of law *de novo*." *United States v. Rodriguez*, 702 F.3d 206, 208 (5th Cir. 2012) (citation and quotation marks omitted); *see also United States v. Harrell*, 894 F.2d 120, 122-23 (5th Cir. 1990) ("The question of whether Miranda's guarantees have been impermissibly denied to a criminal defendant, assuming the facts as established by the trial court are not clearly erroneous, is a matter of constitutional law, meriting *de novo* review."). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001). "Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Montes*, 602 F.3d 381, 384 (5th Cir. 2010). "We review the evidence in the light most favorable to the prevailing party, which in this case is the government." *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005).

---

[2] Both parties agree that the district court's statement should be interpreted as a finding that Mr. Wright was not "in custody" for *Miranda* purposes, rather than that he was not "under arrest."

No. 13-20533

B.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that "the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981). "[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial." *Fare v. Michael C.*, 442 U.S. 707, 709 (1979) (citing *Miranda*, 384 U.S. 444-45). Not only must the current interrogation cease, but as the Supreme Court established in *Edwards v. Arizona*, law enforcement may not re-approach the suspect for further questioning until a lawyer has been made available. *See Edwards*, 451 U.S. at 484 ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."); *see also McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991) (describing *Edwards* as having "established a second layer of prophylaxis for the *Miranda* right to counsel"). The rights established in *Miranda*, such as the right to counsel, "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Davis v. United States*, 512 U.S. 452, 457 (1994) (citation and quotation marks omitted). Importantly, these rights, or measures, were "designed to counteract the 'inherently compelling pressures' of custodial interrogation." *McNeil*, 501 U.S. at 176; *see also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("In *Miranda*, we . . . recognized that 'the coercion inherent in custodial interrogation blurs

7

the line between voluntary and involuntary statements, and thus heightens the risk' that the privilege against self-incrimination will not be observed.").

The Supreme Court has explained that the interest protected by "the *Miranda-Edwards* guarantee . . . relates only to custodial interrogation." *McNeil*, 501 U.S. at 178. "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody.'" *United States v. Salinas*, 543 F. App'x 458, 462 (5th Cir. 2013) (quoting *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997) (overruled on other grounds)). "A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011)). The requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context. *See Bengivenga*, 845 F.2d at 598 (explaining that "a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*"). "The critical difference between the two concepts . . . is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest." *Id.*

"[W]hether a suspect is 'in custody' is an objective inquiry," *J.D.B.*, 131 S. Ct. at 2402, that "depends on the 'totality of circumstances,'" *Cavazos*, 668 F.3d at 193 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "[T]he 'subjective views harbored by either the interrogating officers or the person

being questioned' are irrelevant." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).  "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Bengivenga*, 845 F.2d at 596.

Recognizing that no one fact is determinative, this court has repeatedly considered certain key details when analyzing whether an individual was or was not in custody.  Important factors include: (1) the length of the questioning, *see Harrell*, 894 F.2d at 124 n.1 (5th Cir. 1990) ("[W]e reject the broad proposition that a short delay constitutes *per se* a noncustodial interrogation or that an hour-long delay constitutes a *per se* custodial interrogation.  It is but one, albeit important, factor to consider in applying our objective standard outlined in *Bengivenga*."); (2) the location of the questioning, *see Bengivenga*, 845 F.2d at 599 (emphasizing that the questioning took place "only a short distance" from where the defendants had been, in a location that was not isolated and subjected agents to "public scrutiny"); *Harrell*, 894 F.2d at 125 (holding defendant not in custody where the interrogation took place in "glass conference area" that was "in close proximity to the immigration checkpoint"); (3) the accusatory, or non-accusatory, nature of the questioning, *see Bengivenga*, 845 F.2d at 597 n.16 ("The *awareness* of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him *to conclude, as a reasonable person*, that he is not free to leave . . . ." (citation omitted)); *United States v. Chavira*, 614 F.3d 127, 133-34 (5th Cir. 2010) (emphasizing that the officers told the defendant that "they knew she was not telling the truth"); (4) the amount of restraint on the individual's physical movement, *see Cavazos*, 668 F.3d at 194 (pointing out that defendant

was "followed and monitored" when he tried to go to the bathroom); *Chavira*, 614 F.3d at 134 (holding that defendant was in custody where her "freedom of movement was severely restrained" by officers when they confiscated her birth certificate and ID and handcuffed her to a chair); (5) statements made by officers regarding the individual's freedom to move or leave, *see Cavazos*, 668 F.3d at 195 (finding officers' statements that interview was "non-custodial" relevant but not determinative and explaining that such statements should be "analyzed for their effect on a reasonable person's perception, and weighed against opposing facts"); *United States v. McNair*, 444 F. App'x 769, 770 (5th Cir. 2011) (relying heavily on the fact that officers told the defendant that "he was not under arrest" and was "free to leave" to support a finding that interrogation was non-custodial).

Wright relies heavily on this court's decision in *United States v. Cavazos*, affirming a district court's order suppressing the defendant's incriminating statements under comparable factual circumstances. 668 F.3d at 195. In *Cavazos*, officers executed a search warrant at the home of the defendant, who was suspected of texting sexually explicit material to a minor female. *Id.* at 192. The court summarized the relevant circumstances as follows:

> . . . Just after 5:30 a.m., Cavazos was awakened from his bed, identified and handcuffed, while more than a dozen officers entered and searched his home; he was separated from his family and interrogated by two federal agents for at least an hour; he was informed he was free to use the bathroom or get a snack, but followed and monitored when he sought to do so; and he was allowed to make a phone call, but only when holding the phone so that the agents could overhear the conversation.

*Id.* at 194 (footnote omitted). The court also emphasized that at the start of the search, the officers "immediately located and handcuffed" the defendant,

demonstrating that he was the focus of the search and that the officers "had physical dominion over him." *Id.* at 194-95. While the court acknowledged that the officers told the defendant that the interview was "non-custodial," it explained why this fact was not determinative. *Id.* at 195. The court concluded that the "totality of circumstances, drawn from the record as seen in the light most favorable to [the defendant]," indicated that the defendant was in custody during the questioning that took place in his home. *Id.* at 194 ("An interrogation under such circumstances, and those others discussed above, would lead a reasonable person to believe that he was not 'at liberty to terminate the interrogation and leave.'" (quoting *J.D.B.*, 131 S. Ct. at 2402)).

While Wright correctly identifies similarities between the present case and *Cavazos*, there are significant differences that warrant an opposite holding here. First, unlike in *Cavazos*, we are reviewing a district court's *denial* of a motion to suppress, which means that we must review the evidence in the light most favorable to the government, rather than the defendant. *See Santiago*, 410 F.3d at 197; *cf. Cavazos*, 668 F.3d at 195 (evaluating the record in the light most favorable to the defendant). Also crucial to our decision is the fact that, according to Wright's own testimony, he was told by Officer Barnes "[s]everal times" that he was "free to leave" and that he "wasn't under arrest." *Cf. Cavazos*, 668 F.3d at 195 (evaluating officers' statements that the interview was "non-custodial" and explaining that "to a reasonable lay person, the statement that an interview is 'non-custodial' is not the equivalent of an assurance that he could 'terminate the interrogation and leave'"). Finally, unlike the defendant in *Cavazos*, Wright was not singled out and handcuffed when arresting officers entered his home.[3]     *Cf. Cavazos*, 668 F.3d at 194

---

[3] The district court heard conflicting testimony at the suppression hearing regarding whether Wright was handcuffed by the officers while they were executing the search warrant. Officer Barnes testified that some of the occupants were briefly handcuffed for safety reasons.

(emphasizing that the defendant "was immediately located and handcuffed at the start of the search, demonstrating that the agents sought out Cavazos and had physical dominion over him").

There is no doubt that the presence of 17 to 19 law enforcement officers in and around Wright's home was startling and intimidating. Furthermore, the length of the questioning weighs in favor of finding that it was custodial. *But see Harrell*, 894 F.2d at 124 n.1 (warning against "[o]verreliance upon the length" of the questioning, as it "injects a measure of hindsight into the analysis which we wish to avoid" and rejecting the "broad proposition" that "an hour-long delay constitutes a *per se* custodial interrogation"). On the other hand, Officer Barnes repeatedly assured Wright that he was not under arrest and that he was free to leave. Further, there is no evidence that Wright was physically restrained during the interrogation, which took place close to the home, in a car subject to public scrutiny. Finally, the transcript of the interview, and the cooperative tone throughout, highlights that the conversation was as much an opportunity taken by Wright to tell his story to the officers as it was an opportunity taken by the officers to get information from Wright.

Considering the totality of the circumstances surrounding Wright's interrogation, drawn from the record as seen in the light most favorable to the

---

Wright testified that he was handcuffed for about 10-15 minutes as he was escorted out of the door and that he believed he was the only person who was handcuffed. However, FBI Agent Ryan McKee, who participated in the search of Wright's home, testified that while sometimes the officers do handcuff certain residents for safety reasons, he did not believe that any of the occupants were handcuffed in this case. The district court did not make an explicit finding as to whether Wright had been handcuffed at any point during the execution of the search warrant, but the court did state that "[t]he testimony shows that the defendant was not in handcuffs [when he spoke to Officer Barnes] and had the freedom to remove himself from the vehicle where the questioning was ongoing." Viewing the record in the light most favorable to the government, Wright was not handcuffed; at the very most, Wright was handcuffed for 10-15 minutes along with other occupants of the home and was, thus, neither singled out like the defendant in *Cavazos*, nor handcuffed during the interview in question.

government, we affirm the district court's finding that Wright was not in custody at the time he spoke with the interrogating officer.  Because Wright was not in custody for the purposes of *Miranda*, we find no error in the district court's denial of Wright's motion to suppress.  *See Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005) (explaining that an individual's Fifth Amendment right against self-incrimination, which *Miranda* aims to protect, "is implicated only during a 'custodial' interrogation").  Therefore, we do not reach whether Wright's reference to a lawyer was "an unambiguous or unequivocal request for counsel," as required in this suppression context by *Davis v. United States*, 512 U.S. 452, 461-62 (1994).  *See generally Griffin v. Lynaugh*, 823 F.2d 856, 863 (5th Cir. 1987) ("[W]hen an accused makes an unambiguous but limited request for counsel, in the absence of police interference with the accused's fifth amendment guarantee to counsel, interrogation may proceed after satisfaction of that request."); *United States v. Ivy*, 929 F.2d 147, 153 (5th Cir. 1991) (affirming district court's denial of defendant's motion to suppress where, during the interrogation, the defendant "expressed his unwillingness to answer questions about" a certain topic, and law enforcement "honored this request by moving to a different subject").

## III.

We turn now to Wright's contention that the government violated *Doyle v. Ohio*, 426 U.S. 610 (1976), when, during closing argument, the prosecutor commented on Wright's refusal to answer certain questions during the interrogation.

## A.

The question of whether the government's comment violated the Due Process Clause, as proscribed by *Doyle*, is a constitutional question of law, which this court reviews *de novo*.  *See United States v. Pando Franco*, 503 F.3d 389, 393 (5th Cir. 2007); *see also United States v. Perez-Macias*, 335 F.3d 421,

425 (5th Cir. 2003) ("Constitutional questions are reviewed by this court *de novo*."). If a constitutional error occurred, we must determine whether the error was harmless beyond a reasonable doubt. *See United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999); *see also Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (explaining that "*Doyle* error fits squarely into the category of constitutional violations which we have characterized as 'trial error'" and are thus "amenable to harmless-error analysis").

In *Doyle*, the Supreme Court held "that the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619. The Supreme Court explained that "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* at 618. The Court concluded that because of this implicit assurance, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*; *see also Wainwright v. Greenfield*, 474 U.S. 284, 290 (1986) ("The source of the unfairness was the implicit assurance contained in the *Miranda* warnings 'that silence will carry no penalty.'"). "The Supreme Court has adopted a strict prohibition against the use of post-*Miranda* silence at trial." *Pando Franco*, 503 F.3d at 396; *see also United States v. Shaw*, 701 F.2d 367, 382 (5th Cir. 1983) ("The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation.").[4]

---

[4] "With respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Wainwright*, 474 U.S. at 295 n.13; *see also United States v. Laury*, 985 F.2d 1293, 1304 n.10 (5th Cir. 1993) ("We do not

No. 13-20533

The Court's holding in *Doyle* demonstrates that it is not the arrest and custody that trigger *Doyle* protections, but rather the assurance of *Miranda* warnings.  "First the Court said that a defendant's silence in response to *Miranda* warnings is 'insolubly ambiguous.'  Second, the Court held that by giving *Miranda* warnings, the Government implicitly assures a defendant that he will not be penalized for exercising those rights by remaining silent." *United States v. Rodriguez*, 260 F.3d 416, 420-21 (5th Cir. 2001) (citations omitted); *see also United States v. Carter*, 953 F.2d 1449, 1464 (5th Cir. 1992) ("Subsequent Supreme Court decisions have clarified that the *Doyle* protection derives primarily from the implicit assurance of the *Miranda* warnings and thus is strongest in the context of immediate post-*Miranda*-warning interrogation."); *Kappos v. Hanks*, 54 F.3d 365, 368-69 (7th Cir. 1995) (explaining that "the promise contained in the statement of *Miranda* rights precludes the prosecutor from commenting on the defendant's silence" even if that silence occurred "prior to his arrest"); *United States v. Quinn*, 359 F.3d 666, 677 (4th Cir. 2004) ("In evaluating *Doyle*-type claims, we focus on the question whether the government made any assurances to the defendant, either explicit or implicit, that his silence would not be used against him."). Consistent with this understanding of *Doyle*, the Supreme Court has subsequently described it "as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him." *Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (holding that *Doyle* does not prohibit the government from commenting on a defendant's post-arrest, *but pre-Miranda warnings*, silence).

---

believe, however, that the Supreme Court in *Doyle* intended that a defendant remain *completely* silent following arrest in order to rely on the protection of the due process clause.").

15

No. 13-20533

"A prosecutor's or witness's remarks constitute comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark." *United States v. Andaverde-Tinoco*, 741 F.3d 509, 520 (5th Cir. 2013) (citation and quotation marks omitted); *see also Moreno*, 185 F.3d at 473 ("*Doyle* governs where the comments are designed to draw meaning from silence." (citation and quotation marks omitted)). In order to determine whether the prosecutor's comments violated *Doyle*, those comments must be evaluated in context. *See Shaw*, 701 F.2d at 381 ("Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur. . . .").

### B.

In the present case, the government had to prove, as an element of the charges, that Wright acted *knowingly*—that Wright "knowingly distributed materials containing child pornography" and that he "knowingly possessed materials containing images of child pornography." The government also had to prove that Wright *knew* that the materials contained child pornography. While Wright did not present any evidence of his own, he tried to raise a reasonable doubt as to whether the government had established the element of knowledge.

The government, in its principal closing argument, warned the jury that it "may hear argument that [Wright] didn't intend to do it. He didn't want to do it." The prosecutor stated:

> But he knew that it was child pornography. How do we know he knew it was child pornography? It's very interesting he says he uses the term "PTHC" because you get better stuff. And he's referring to adult pornography, because he says that if you don't put that in there, you're going to get the old women. He wants the young stuff.

16

Then the prosecutor added: "It's interesting though. He won't tell Officer Barnes what ages he searches for." Wright's lawyer objected to this reference to Wright's refusal and argued to the judge that it was "a comment on [Wright's] exercising his right to remain silent" and Wright's "refusal to answer questions after he was given Miranda and told he could remain silent." The district judge overruled the objection, and the government then elaborated:

> In fact, he won't tell Officer Barnes what ages he uses in search because, he says, 'Because I don't want to get in trouble.' You saw the images. You saw that they are matched up with the ages in the title of the file. There's no accident. There's no mistake. This is exactly what he was looking for, and this is exactly what he got.

On appeal, Wright argues that the district court erred in overruling his objection.

### C.

Evaluated in narrow context, the prosecutor identified a piece of Wright's defense (lack of knowledge of children's ages) and then sought to impeach that defense by commenting on Wright's purportedly inconsistent act of refusing to answer certain questions about that topic. Drawing attention to Wright's avoidance of questions pertaining to his use of certain search terms could raise the inference that Wright used impermissible search terms, and thus *knew* that he was downloading child pornography. The prosecutor's comments thus drew meaning from Wright's refusal to answer questions yet, Wright argues, his refusal was invited by Officer Barnes through his recitation of *Miranda* warnings and his reassurance that Wright should "only talk to [Officer Barnes] about stuff that [he wanted to] talk about."

Preliminarily, we note that the prosecutor's inference, elaborated after sidebar contended that Wright "won't tell Officer Barnes what ages he uses in

search because, he says, 'Because I don't want to get in trouble,'" drew a link not to Wright's silence nor to any invocation of counsel but instead to Wright's separate admission about wanting to avoid trouble, as well as to the photo evidence itself: "You [the jury] saw the images. You saw that they are matched up with the ages in title of the file. There's no accident. There's no mistake. This is exactly what he was looking for, and this is exactly what he got."

With this context in mind, yet with the strictness of *Doyle* exactitude also in mind, we choose to assume arguendo that the initial inculpatory inference of reluctance to answer child age questions, without connection immediately thereafter to Wright's admitted concern about "trouble" and to the exhibit evidence of the photos, would be improper, hence we proceed to assess whether such error was harmless beyond a reasonable doubt. *See Shaw*, 701 F.2d at 382. This is not an easy task, as "[c]ircumstances that render *Doyle* error harmless have defied formulaic precision for almost half a century." *Andaverde-Tinoco*, 741 F.3d at 522 n.2. "An error is harmless only if we can determine beyond a reasonable doubt that the improper [comments] did not contribute to the jury's verdict." *Moreno*, 185 F.3d at 475. Determining the effect of the error "requires 'an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the defendant's guilt.'" *Shaw*, 701 F.2d at 383. "[T]his Court's basic concern has been whether or not the improper comment was harmless error because by its nature and under the circumstances it would have only an insignificant impact on the jury." *Id.*

In *Chapman v. United States*, this court developed a framework for analyzing the harmlessness of *Doyle* violations by categorizing our prior cases

No. 13-20533

into three groups.[5] *See Carter*, 953 F.2d at 1462. "Subsequent cases have illustrated, however, that factual situations are not always amenable to description within the rigid *Chapman* types," therefore we have repeatedly emphasized that we look to the *Chapman* framework for guidance in performing a case-specific harmlessness analysis.[6] *Shaw*, 701 F.2d at 382-83; *see also United States v. Rodriguez*, 43 F.3d 117, 121-22 (5th Cir. 1995) ("Many cases cannot be resolved solely by reference to the *Chapman* categories; in such instances, we apply a case-by-case approach using the *Chapman* categories as guidelines for assessing the prejudice to the defendant in a particular context, including the strength of the evidence."). Again, this court has explained that

---

[5] In *Chapman*, the court grouped prosecutors' impermissible comments into three categories:

> (1) When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.
> (2) When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.
> (3) When there is but a single reference at trial to the fact of defendant's silence the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

*Rodriguez*, 260 F.3d at 422 (citing *Chapman*, 547 F.2d at 1249-50).

[6] "For analytical purposes, it is important to differentiate cases falling within *Chapman*'s first category from cases in the other two categories. The second and third categories articulated in *Chapman* are not to be used as rigid rules, but only as helpful guides." *Rodriguez*, 260 F.3d at 422 n.3 (citation and quotation marks omitted). The "first category includes *Doyle* violations that explicitly or repeatedly link the silence to the exculpatory story; these are harmful *per se*, affecting the fundamental fairness of the trial, and require reversal." *Moreno*, 185 F.3d at 475.

"Fifth Circuit cases subsequent to *Chapman* have substantially modified its apparent rigidity, have recognized that many cases fall somewhat between its categories, and have declined to reverse even where the exculpatory story is not totally implausible but the evidence of guilt is substantial or overwhelming." *United States v. Martinez-Larraga*, 517 F.3d 258, 270 n.10 (5th Cir. 2008). This is consistent with the Supreme Court's general clarification of *Doyle* errors as "trial error[s]," which the Court explained are amenable to the *Chapman v. California*, 386 U.S. 18 (1967), harmless-beyond-a-reasonable-doubt standard. *See Brecht*, 507 U.S. at 629-30. Similarly, other circuits have declined to embrace a rigid, automatic-reversal standard. *See, e.g., Phelps v. Duckworth*, 772 F.2d 1410, 1413 (7th Cir. 1985); *Gov't of Virgin Islands v. Davis*, 561 F.3d 159, 165 (3d Cir. 2009); *United States v. Ramirez-Estrada*, 749 F.3d 1129, 1137 (9th Cir. 2014).

Regardless of the helpfulness of the *Chapman* groupings to any given case, the prosecutor's comment in the present case does not fit squarely into or out of *Chapman*'s first category. First, Wright's refusal to answer certain questions took place prior to his arrest, unlike the heartland of *Chapman* category one. *See Chapman*, 547 F.2d at 1249 (describing the reversible category of *Doyle* errors as occurring when the "prosecution uses defendant's *post-arrest silence* to impeach an exculpatory story" (emphasis added)); *cf. Kappos*, 54 F.3d at 368-69 ("But the fact that an arrest had not yet occurred does not render *Doyle* inapplicable."). Second, although the initial comment and inference was made by the prosecutor, rather than elicited from a witness, the prosecutor did not directly link silence with the implausibility of Wright's exculpatory story. Instead, the prosecutor elaborated: "He won't tell Officer Barnes what ages he uses in search because, he says 'Because I don't want to get in trouble,'" linking Wright's reluctance to answer certain questions with an admission he did volunteer to Officer Barnes. *See Wainwright v. Greenfield*,

No. 13-20533

474 U.S. 284, 301 (1986) (Rehnquist, J., concurring) (finding *Doyle* error likely harmless where it was based on testimony that was already heard by the jury and "was there for the jury to consider on its own regardless of whether the prosecutor ever mentioned it"); *see also Anderson v. Charles*, 447 U.S. 404, 409 (1980) ("Any ambiguity in the prosecutor's initial questioning was quickly resolved by explicit reference to Detective LeVanseler's testimony, which the jury had heard only a few hours before.").

Also important is the fact that the prosecutor's isolated, original comment did not "strike at the jugular" of Wright's defense. *Compare United States v. Harp*, 536 F.2d 601, 603 (5th Cir. 1976) ("Because the prosecutor's comments struck at the jugular of [the defendants'] story, those remarks cannot be classified as harmless."), *and United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir. 1977) (finding reversible *Doyle* error where the impermissible testimony "went to the heart of the sole defense"); *with Carter*, 953 F.2d at 1465 (finding *Doyle* error harmless where "the story being impeached [was] essentially peripheral to [the defendant's] defense"), *and United States v. Davis*, 546 F.2d 583, 595 (5th Cir. 1977) (emphasizing that *Doyle* error did not "[strike] at the jugular" of the defendant's story because the defense being attacked was "paper-thin"). During opening argument, Wright's counsel characterized the case as being "about who did it. That's it. This is essentially a case about the keeper of the inn and all the people he allowed to stay in the inn, all the occupants of that house." Consistent with this statement, Wright's primary defense throughout trial was that someone else in the house could have been responsible. Then in closing argument, similarly, Wright's counsel emphasized to the jury: "And as I told you earlier, this case, in opening statement [defense counsel] told you, it's a who done it, who actually put the child pornography on the hard drive." The argument that Wright did not *know* that the images he was downloading were child pornography was

21

arguably in tension with Wright's primary defense, and was only alluded to by defense counsel during the cross examination of Officer Barnes as well as briefly during opening and closing arguments.

The fact that the prosecutor's initial, *Doyle*-implicating comment was isolated, rather than repeated, further reduces the possibility of prejudice. *See Shaw*, 701 F.2d at 383 (finding no reasonable possibility that "isolated and unsolicited" reference to defendant's silence contributed to his conviction). Again, the jury had already listened to the 43-minute audio recording of the interview and received the transcript, thus, it already knew what Wright said, his admission about not wanting to get in trouble, and his accommodation with Officer Barnes not to delve into the topic of children's ages.

Finally, the government presented strong evidence that Wright knew that at least some of the images were child pornography. The interview transcript itself, as elaborated in this closing argument circumstance, provides strong evidence of Wright's knowledge. Wright admitted to Officer Barnes that when he searched with the search term PTHC he got about 50% child pornography, which he claimed that he would delete quickly because he knew it was illegal. Wright also stated that "the kid stuff" is "like drugs." Taken together, the prosecutor's terse comment then tied to Wright's volunteered admission and the photo evidence, along with Wright's primary blame-shifting defense and the strong evidence presented to the jury regarding his knowledge that some of the downloaded images were child pornography, convince us that the prosecutor's comment was harmless.

## IV.

Wright's final issue on appeal pertains to the district court's refusal to allow Wright's counsel to respond to the government's sentencing presentation at the sentencing hearing. Wright argues that the district court violated

No. 13-20533

Federal Rule of Criminal Procedure 32 and denied his attorney a meaningful opportunity to speak on his behalf.

A.

We review a district court's compliance with Federal Rule of Criminal Procedure 32 *de novo.  See United States v. Medina*, 161 F.3d 867, 874 (5th Cir. 1998) ("We review the district judge's implementation of Rule 32(c)(1) *de novo.*"); *see also United States v. Myers*, 150 F.3d 459, 461 (5th Cir. 1998) ("We review *de novo* whether a district court complied with a Federal Rule of Criminal Procedure."), *abrogated on other grounds by United States v. Reyna*, 358 F.3d 344 (5th Cir. 2004).

B.

Wright was sentenced on September 9, 2013.  At the sentencing hearing, after some preliminary matters, the court called upon Wright's attorney to allocute with respect to the sentence the court should impose.  The court stated, "[w]e'll start with you, counsel, and then we'll hear from [the prosecutor], and then finally from your client."  Wright concedes that his lawyer, who spoke for three minutes before voluntarily concluding her allocution, was allowed to "make an initial presentation to the district court without interruption." During her allocution, defense counsel asked the court to grant Wright a downward variance because, she argued, the sentencing guidelines are outdated and "barbaric" and because Wright had overcome a difficult upbringing.  Defense counsel sought a 120-month sentence and argued that "the nature of this offense and the facts which the Court heard and saw during the trial" did not warrant a sentence close to the statutory maximum of 20 years, which is what the guidelines called for.

The government provided a response that lasted slightly over four minutes.  The government argued that the guidelines were appropriate and that Wright's "situation and how he perpetrated this crime" placed him in the

"heartland" of the guidelines. The government claimed that Wright's previous hardships did not warrant leniency. The government also asserted that there had been allegations of abuse against Wright in the past, although they were not thoroughly investigated. The government spoke about the many victims of Wright's crime, the children who were abused in the images, and asked the court for a sentence of 262 months imprisonment—"[a] sentence at the high end of the guidelines."

After the government concluded, defense counsel asked if she could "briefly respond." The court responded: "I want your client to respond. These are just arguments, counsel. You've made your statement, the government's made its statement. Mr. Wright, you may speak." Defense counsel objected to "not being allowed to allocute" and the court overruled the objection. Wright stated, "I put myself to the mercy of the Court."

On appeal, Wright argues that the district court reversibly erred by refusing to allow defense counsel to respond to the government at sentencing. Wright contends that his right to allocute, as provided by Federal Rule of Criminal Procedure 32, was violated because his defense counsel was "not afforded a 'meaningful' opportunity to allocute" on his behalf. While Wright states that "[t]his is not to say that, in every case, a response/rebuttal from defense counsel will be necessary to comply with Rule 32(i)(4)(A)(i)," Wright claims that here, where the government brought up new issues during its allocution, defense counsel needed to be given an opportunity to address those issues.

## C.

Federal Rule of Criminal Procedure 32 provides that:

> Before imposing sentence, the court must:
>
> (i)     provide the defendant's attorney an opportunity to speak on the defendant's behalf;

> (ii)    address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and
>
> (iii)   provide an attorney for the government an opportunity to speak equivalent to that of the defendant's attorney.

Fed. R. Crim. P. 32(i)(4)(A). As Rule 32 makes clear, the sentencing court must allow *both* defense counsel and the defendant himself, as well as the government, an opportunity to speak before imposing a sentence. *Id.* In order to satisfy Rule 32, the district court "must apply the rule 'quite literally.'" *United States v. Magwood*, 445 F.3d 826, 829 (5th Cir. 2006) (quoting *United States v. Dickson*, 712 F.2d 952, 956 (5th Cir. 1983)). Rule 32 provides no details about how much time each individual should be allowed to speak or whether the district court can place limitations on the length or subject matter of the allocutions. Other circuits have sensibly explained that the district court is allowed to place some limits on the parties' right to allocute. *See United State v. Li*, 115 F.3d 125, 133 (2d Cir. 1997) ("[A] defendant's right to allocution is not unlimited in terms of either time or content."); *United States v. Maldonado-Zamora*, 325 F. App'x 655, 657 (10th Cir. 2009) (acknowledging that a district court "has some discretion to place reasonable limits on what may be addressed" during allocution). In an effort to create some limiting principle, courts have consistently indicated that the opportunity to speak must be "meaningful." *See United States v. Valtierra-Ortega*, 402 F. App'x 34, 36 (5th Cir. 2010) (agreeing with government's concession that defense counsel was not given a "meaningful opportunity" to argue on defendant's behalf where district court refused to allow counsel to make "a general mitigation argument or one for downward departure"); *United States v. Gutierrez*, 555 F.3d 105, 110 (2d Cir. 2009) ("We agree that a defense counsel's opportunity to argue at a sentencing hearing—like a defendant's opportunity to address the sentencing

No. 13-20533

court—must be meaningful."); *Li*, 115 F.3d at 134 (finding that district court violated Rule 32 where defendant was not "able to speak meaningfully of the factors that she legitimately thought relevant to the mitigation or her sentence").

In the present case, we find that Wright's attorney was given a meaningful opportunity to speak on Wright's behalf. The district court explicitly told the parties how the allocutions would proceed and then strictly complied with the language of Rule 32, allowing all three individuals to speak. Not only did the district court give Wright's lawyer an opportunity to speak, but it did so without placing any time or subject-matter limitations on that opportunity. Wright's lawyer voluntarily concluded her allocution after she spoke, uninterrupted, for several minutes. Furthermore, the prosecutor's statements to which "defense counsel felt the need to respond," pertained to information that was contained in the PSR. Thus, it was not new to either party or the district court and defense counsel had a meaningful opportunity, during her initial allocution, to discuss those topics if she wanted to. Because Wright's lawyer was given a meaningful opportunity to speak on Wright's behalf—for as long as she wanted and about any subject that she saw fit—we find that the district court complied with Rule 32.

## V.

For the foregoing reasons, we AFFIRM Wright's conviction and sentence.