# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2021

Lyle W. Cayce
Clerk

No. 20-40040

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JOEL VARGAS; ANGELICA MARIA VARGAS,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 1:18-CR-7-3 and 1:18-CR-7-5

Before HIGGINBOTHAM, STEWART, and WILSON, *Circuit Judges*.
PATRICK E. HIGGINBOTHAM, *Circuit Judge*:

A jury convicted Joel Vargas on two counts of transporting stolen goods in interstate or foreign commerce and one count of conspiracy to do the same based on his leadership of a crew of burglars, which targeted commercial tire stores. The jury also convicted Joel's wife, Angelica, of conspiracy to transport stolen goods based on her role as the crew's paymaster and alternate burglary driver. Finally, the jury convicted Joel of witness tampering based on evidence that he threatened the father of the crew member who cooperated with law enforcement in Joel's arrest.

No. 20-40040

On appeal, the Vargases contend that the district court impermissibly amended the indictment at trial and that the Government failed to produce sufficient evidence to sustain any of their convictions. We AFFIRM.

## I.

For nearly a decade, Joel worked with his brother Arthur, burglarizing commercial tire dealers throughout Texas and reselling stolen truck tires. The brothers and their confederates would cut through fencing and metal storage buildings, disable the security systems, and take the tires away in stolen U-Haul trucks. The brothers committed dozens of burglaries in this manner, but two are particularly relevant here because they are the specific incidents for which the Government indicted Joel: (1) a December 17, 2017 burglary of a Goodyear Store in Beaumont, Texas and (2) a December 22, 2017 burglary of a Goodyear Store in Longview, Texas. Joel organized and participated in both jobs, employing the same methods described above, and making off with $38,094 and $33,100 in merchandise.

The high volume of similar tire-dealer burglaries eventually caught the attention of law enforcement. In 2017, Detective Tina Lewallen of the Beaumont Police Department was attempting to solve the local Goodyear heist when she discovered that tire dealers across Texas had been hit in a similar fashion. She called local police departments and was given the names Arthur Vargas, Joel Vargas, Barkhi Holley, and Alfonso Sosa as persons arrested or suspected in connection with the burglaries. Lewallen eventually made contact with Public Safety Special Agent Carol Frost in San Antonio, who had been investigating a similar string of burglaries.

Lewallen and Frost, together with federal authorities, then coordinated a sting operation in which they used an undercover agent to induce Arthur and several crew members to pick up a load of stolen tires in Lake Charles, Louisiana and transport them back to Texas. Arthur took the

bait, and on January 19, 2018, he and several crew members drove to Lake Charles and loaded the stolen tires into a U-Haul. Beaumont police promptly arrested Arthur, et al. as they returned to Texas. When Lewallen interviewed one of the arrested crew members, Barkhi Holley, he admitted committing additional burglaries with Arthur's brother, Joel. Holley also identified other crew members who remained at large, including Angelica Vargas, Alfonso Sosa, and Ramon Gonzales.

Several crew members told Lewallen that Joel stored his tires on property owned by Ramon's father, Mario Gonzales. So, Lewallen and Frost went searching for Ramon and Mario. When officers located the father and son, Ramon admitted that he had been committing burglaries with Joel and that Joel had another job planned for that very evening, April 10, 2018. Ramon agreed to assist the officers in a sting operation and accompanied them to the site of the planned job. Officers arrested several crew members as they were loosening lug nuts on a truck wheel. Joel was stopped nearby, and arresting officers found the tools of his trade—"a heavy-duty bottle jack, and numerous wooden blocks of the type on which trucks were left"—in his vehicle.

Shortly after bonding out of jail, Joel paid a visit to Mario. Joel told Mario that Ramon had set him up on the night of his arrest. Joel wanted Mario to convince Ramon to change his story regarding the failed burglary. Joel, knowing that Mario belonged to an outlaw biker club affiliated with the Bandidos MC, told him that the "red and gold" (the MC's colors) "would not be happy" if they knew that Ramon had cooperated with law enforcement. Mario understood Joel was threatening to jeopardize his status in the club and perhaps incite club members to retaliate for Ramon "snitching" to law enforcement. Mario called Agent Frost shortly after his encounter with Joel, warning her that "he might have to kill someone" if they came to his place.

In January 2019, an Eastern District of Texas grand jury returned a four-count indictment against Joel and Angelica Vargas. Joel was indicted on two counts of transporting stolen goods "in interstate commerce from the State of Texas to Mexico" in violation of 18 U.S.C. § 2314, on the theory that he sold the tires from the December 17 & 22, 2017 burglaries to individuals who then resold them in Mexico. The grand jury indicted both Joel and Angelica on one count of conspiracy "to transport stolen tires in interstate commerce." Finally, the grand jury indicted Joel on one count of attempting to "intimidate, threaten, and corruptly persuade" Ramon to change his testimony in connection with the grand jury's investigation.

Joel and Angelica went to trial on all four counts. In addition to the facts recited above, the jury heard testimony from former crew members about Joel's connections to the Mexican tire market. Regarding Angelica, former crew members described her as the crew's paymaster, who would also drive and provide a change of cars when needed for a burglary. Finally, crew members told the jury that around August or September of 2017, Joel and Arthur had a falling-out and that the two worked on separate burglaries from that point until their respective arrests in 2018.

At the close of trial, the district court instructed the jurors that they could convict Joel on Counts One and Two if they found he "transported or caused to be transported in interstate or foreign commerce items of stolen property." On Count Three, the court instructed the jurors that they could find Joel and Angelica guilty if they "made an agreement to commit the crime of interstate or foreign transportation of stolen property." After four days of testimony, and two hours of deliberation, the jury convicted Joel on all four counts and convicted Angelica on the lone count of conspiracy with which she was charged. The district court sentenced Joel to 120 months each on Counts One and Two, 60 months on Count Three, and 235 months on Count

No. 20-40040

Four, all to be served concurrently. The district court sentenced Angelica to 60 months on Count Three.

Both Joel and Angelica appealed.

## II.

Joel and Angelica raise two types of arguments on appeal. First, they contend that the district court impermissibly broadened the bases on which the jury could convict them on Counts One, Two, and Three, resulting in a constructive amendment of the indictment, which violated their Fifth Amendment rights. Second, Joel and Angelica challenge the sufficiency of the evidence supporting their convictions.

### A. Constructive Amendment

Joel and Angelica argue that the district court's instructions to the jury constructively amended the indictment on Counts One, Two, and Three. Because the Vargases raise this argument for the first time on appeal, we review for plain error.[1] To prevail under the plain error standard, the Vargases must show "(1) there is an error, (2) that is clear or obvious, and (3) that affects [their] substantial rights" and that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."[2] "Ordinarily, to show that a clear and obvious error affected his substantial rights, a defendant must show a reasonable probability that, but for the error,

---

[1] *United States v. Stanford*, 805 F.3d 557, 566 (5th Cir. 2015).

[2] *Id.* (internal quotations omitted).

No. 20-40040

the outcome of the proceeding would have been different."[3] If this showing is made, then we have discretion to correct the error.[4]

"A criminal defendant has a Fifth Amendment right to be tried only on charges presented in a grand jury indictment, and therefore only the grand jury may amend an indictment once it has been issued."[5] "A constructive amendment occurs . . . when the Government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment."[6] The Vargases contend that the district court's instructions allowed the jury to convict on alternative jurisdictional bases not charged in the indictment.

On Counts One & Two, Joel argues that the district court's instructions indicated to the jury that it could convict him if he transported stolen goods in foreign or interstate commerce, whereas the indictment made it clear that Joel was charged only with transporting goods in *foreign* commerce, from Texas to Mexico. The indictment is imprecise. Both Counts One and Two use the term "interstate commerce" but then reference only Joel's supposed commerce with Mexico. It is difficult for Joel to maintain that the district court amended the indictment by instructing the jury using the same word contained in the indictment—"interstate commerce"—even if it is apparent that what the indictment really meant was foreign commerce.

---

[3] *United States v. Staggers*, 961 F.3d 745, 755 (5th Cir. 2020) (internal quotations omitted).

[4] *Id.*

[5] *United States v. Daniels*, 252 F.3d 411, 413 (5th Cir. 2001).

[6] *United States v. Diaz*, 941 F.3d 729, 736 (5th Cir. 2019) (internal quotations omitted).

No. 20-40040

But assuming Joel is correct that this was not only an error, but a plain one, he offers no argument for how this discrepancy violated his substantial rights.

From the prosecution's opening statement, to its case-in-chief, to its closing statement, the trial record makes clear that the Government was attempting to prove that Joel sold tires into Mexico. The Government provided no evidence that Joel himself transported tires from or sold tires to states beyond Texas. So, it is unclear what evidence the jury might have used to convict him for purely domestic, interstate transport—Joel does not identify any. Thus, it is highly probable that the jury convicted Joel on Counts One and Two based on the conduct charged in the indictment and highly improbable that the alleged amendment led to Joel's convictions.

On Count Three, Joel and Angelica contend that the indictment charged them with conspiracy to transport stolen goods only in interstate commerce, while the court's instructions to the jury again permitted a conviction based on either interstate or foreign commerce. Unlike Counts One and Two, Count Three referenced not Mexico but the Lake Charles, Louisiana burglary that led to Arthur's arrest. This indicates that the grand jury indicted Joel and Angelica for having been part of a larger tire-theft conspiracy that transported stolen tires into Texas from Louisiana. Because Count Three of the indictment did not refer to Mexico or to foreign commerce generally, the district court's instructions broadened the jurisdictional bases for conviction when it added "foreign transportation" to the jury instructions on this Count. But again, neither defendant identifies a resulting effect on their substantial rights, at least not one that "seriously affects the fairness, integrity, or public reputation of judicial proceedings."[7] Leaving the question of Mexican commerce for later, the Government's

---

[7] *United States v. McGilberry*, 480 F.3d 326, 331–32 (5th Cir. 2007).

No. 20-40040

evidence supported the theory that Joel, Angelica, and Arthur were involved in a single tire-theft conspiracy that persisted at the time of the Lake Charles job, despite the brothers' alleged falling-out in 2017.[8] Thus, the Vargases cannot show the amendment affected their substantial rights because the trial record contained evidence supporting a guilty verdict on the crime actually charged in the indictment. And in such cases, we decline to exercise our discretion to grant relief on a constructive amendment claim.[9]

### B. Transportation of Stolen Goods in Foreign Commerce

Joel challenges the sufficiency of the evidence to convict him on Counts One and Two of the superseding indictment. Because Joel moved for an acquittal at the close of the Government's case, we review the sufficiency of the evidence de novo.[10] We assess a sufficiency challenge by asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[11] "Courts are to 'accept all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict.'"[12] Nonetheless, "the evidence presented must allow the jury "to find every element of the offense beyond a reasonable doubt."[13]

---

[8] As discussed later, the jury reasonably resolved the Vargases' withdrawal defense in the Government's favor.

[9] *See, e.g.*, *McGilberry*, 480 F.3d at 332.

[10] *United States v. Woerner*, 709 F.3d 527, 535 (5th Cir. 2013).

[11] *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (emphasis original).

[12] *United States v. Velasquez*, 881 F.3d 314, 328 (5th Cir. 2018) (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)).

[13] *United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006).

No. 20-40040

And the Government "must do more than pile inference upon inference" to sustain a conviction.[14]

In Counts One and Two, the Government charged Joel with transportation of stolen property from the December 17 and 22, 2017 burglaries in violation of 18 U.S.C. § 2314. To obtain a conviction under § 2314, the Government had the burden of proving "(1) the interstate transportation of (2) goods, merchandise, wares, money, or securities valued at $5,000 or more . . . (3) with knowledge that such items have been stolen, converted, or taken by fraud."[15] Joel contends the Government failed to prove the first element because its evidence did not establish that tires from the charged burglaries "were transported in interstate commerce from the State of Texas to Mexico."

"Transport of the goods through interstate commerce is an element of the crime which the Government must prove to obtain a conviction."[16] The Government may do so using circumstantial evidence.[17] Further, the Government need only show that the defendant caused stolen goods to travel in interstate (or foreign) commerce; it need not show that the defendant personally transported the goods or could foresee the stolen goods would travel across state lines.[18]

Although this is a close question, we hold that the Government offered enough evidence for a rational juror to conclude that Joel sold his stolen tires

[14] *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir. 1993).

[15] *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016) (internal quotations omitted).

[16] *United States v. Henriques*, 234 F.3d 263, 265 (5th Cir. 2000).

[17] *See* 66 Am. Jur. 2d Receiving Stolen Property § 53.

[18] *United States v. Bremers*, 54 F. App'x 591 (5th Cir. 2002).

to buyers who then transported or sold them into Mexico. Michael Lopez, a member of the tire-theft crew until his 2013 arrest, testified that Joel often sold tires to a Mexican man living in San Antonio. This buyer told Joel and Lopez that "he had people that were in Mexico that he would give tires to." Lopez stated that there was no doubt in his mind that the tires ended up in Mexico. Barkhi Holley also testified that the crew often sold tires to buyers who resold them in Mexico. Holley's testimony was specific to Arthur's sales, but in tandem with Lopez's testimony, the evidence at trial illustrated how Joel disposed of stolen tires and established that the crew generally, and Joel specifically, had contacts with Mexican buyers. Given the depth and breadth of this tire theft operation, we are persuaded that jurors could reasonably conclude that Joel's behavior in 2017 was similar to his prior behavior and that the stolen tires he sold reached Mexican markets.

## C. Conspiracy to Transport Stolen Goods in Interstate Commerce

Joel and Angelica raise a similar sufficiency challenge to the evidence supporting their convictions on Count Three for conspiracy to violate § 2314. We review this claim under the same de novo standard, viewing the evidence and available inferences in the light most favorable to the jury's verdict.[19]

To prove conspiracy, the Government needed to show "(1) an agreement between two or more persons (2) to commit the underlying crimes and (3) an overt act committed by one of the conspirators in furtherance of the agreement."[20] The Vargases challenge the Government's proof of the underlying crime element. Again, the focus of the Vargases' attack is on § 2314's interstate transportation element, but on the conspiracy count, they

---

[19] Like Joel, Angelica moved for a judgment of acquittal at the close of the Government's case.

[20] *United States v. Onyiego*, 286 F.3d 249, 254 (5th Cir. 2002).

run into the difficulty that Arthur was caught transporting stolen tires from Louisiana to Texas, which tends to establish that the larger tire-theft conspiracy had the necessary interstate component. The Vargases attempt to overcome this difficulty by asserting that Joel's crew "split" with Arthur's crew around August 2017, after the brothers had a falling-out. The Vargases argue that because the crews effectively split before Arthur's Louisiana job, the Government cannot use the interstate nature of that burglary to convict them for conspiracy.

By asserting that the burglary crews split up, Joel and Angelica essentially argue that they withdrew from the conspiracy with Arthur and started a new criminal conspiracy, one with the same methods and aims but without the interstate element. But "[a] defendant is presumed to continue in a conspiracy unless he makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose."[21] "Establishing individual withdrawal [is] a burden that rest[s] firmly on the defendant regardless of when the purported withdrawal took place"—a burden perfectly consistent with due process because withdrawal is an affirmative defense, not an element of the charged offense.[22] "In order to show withdrawal, the defendant must show that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators."[23] Thus, it was not the Government's responsibility to "overcome . . . beyond a reasonable doubt" the Vargases' assertion of a withdrawal via "split"; it

---

[21] *United States v. Torres*, 114 F.3d 520, 525 (5th Cir. 1997).

[22] *Smith v. United States*, 568 U.S. 106, 110 (2013).

[23] *United States v. Heard*, 709 F.3d 413, 428 (5th Cir. 2013) (internal quotations omitted).

was the Vargases' burden to prove to the jury's satisfaction that after 2017 they were no longer involved with Arthur.[24]

"Given the absence of any jury determination that [the Vargases] left the conspiracy, we can overrule part of the verdict and find withdrawal only if [the Vargases] can show that is the only reasonable view of the evidence."[25] The Vargases cannot make this showing. Joel does not deny that he continued pursuing the same criminal ends even after the supposed split with Arthur. And the Government offered evidence that despite the personal falling-out between brothers, the business of the burglary ring continued apace. For instance, the jury heard evidence that after the supposed split at least two crew members worked with both Joel and Arthur and that the separate crews continued to operate as one "big group." Crew members who generally worked with Arthur still knew about and discussed the burglaries undertaken by those working with Joel. The jury heard testimony about the alleged split and rejected the assertion of withdrawal, concluding that the nominally separate crews remained, in effect, one conspiracy. Such a fact finding is founded largely on a "credibility choice," which this Court is bound to respect because it is not clearly unreasonable.[26]

Angelica separately argues that the jury had insufficient evidence from which to infer that she agreed to join the conspiracy. Her brief portrays her as a simple payroll clerk, unaware of the source of the money she was dispensing to Joel's associates after the burglaries. But the evidence at trial revealed considerably more about Angelica's role. For instance, Ramon

---

[24] *Smith*, 568 U.S. at 110.

[25] *United States v. Hoffman*, 901 F.3d 523, 545 (5th Cir. 2018), *as revised* (Aug. 28, 2018).

[26] *Portillo*, 969 F.3d at 164.

Gonzales testified that Angelica acted as an auxiliary driver for burglaries, providing the crew with an alternate vehicle to help them escape the notice of would-be witnesses. Barkhi Holley also told law enforcement that Angelica participated in a job in Bryan, Texas with both Joel and Arthur and that "Angelica had driven to commit at least six burglaries." When asked at trial if he still thought his statement was true, he said "I believe so." This was more than adequate evidence for the jury to infer that Angelica knew of and assented to participate in the tire-theft conspiracy.

Defense counsel attempted to discredit Holley's testimony by exploring his history of drug-use on cross examination, but credibility determinations are the jury's province. Moreover, Angelica has not disputed the accuracy or credibility of Ramon's testimony. To the extent Angelica argues that the jury had insufficient evidence to infer her knowledge of the conspiracy's interstate dimension, the argument is unavailing; the Government was not required to prove she actually knew of the interstate transport, which is jurisdictional only.[27]

### D. Witness Tampering

Finally, Joel challenges the sufficiency of the evidence to convict him on Count Four, for tampering with a witness—Ramon Gonzales, in violation of 18 U.S.C. § 1512(b)(1). This charge stemmed from Joel's visit to Ramon's father, Mario, during which Joel said that the outlaw motorcycle club to which Mario belonged "would not be happy" if they learned that Ramon had assisted law enforcement in arresting Joel. Mario testified that Joel wanted

---

[27] *Bremers*, 54 F. App'x 591, at *6 (citing *United States v. Mitchell*, 588 F.2d 481, 483 (5th Cir. 1979)).

him to ensure "that [his] son told a different story" about the burglary that led to Joel's arrest.

Joel first argues that no reasonable juror could have credited Mario's account of the threats Joel made because Mario gave conflicting testimony regarding *when* he told law enforcement about those threats. But "this [C]ourt's role does not extend to . . . assessing the credibility of witnesses,"[28] and we "cannot nullify the jury's verdict based on the assertion that the testimony offered at trial was not credible."[29] Mario initially testified that he told law enforcement about his encounter with Joel in April 2018, a few days after Joel got out of jail.  But he later indicated that he did not inform law enforcement until January 2019. Mario's testimony may have been inconsistent on this fact, but Officer Lewallen's testimony and her case report corroborated Mario's original answer—that he first contacted law enforcement regarding Joel's threats in April 2018. Thus, there was a factual dispute and a credibility issue at trial, which the jury alone was entrusted with resolving. They did so in the Government's favor.[30]

Joel also contends that he could not be convicted under § 1512 because he could not have foreseen a prosecution by federal authorities after his arrest.[31] To be convicted under § 1512, a defendant must be able to foresee

---

[28] *United States v. Beacham*, 774 F.3d 267, 274 (5th Cir. 2014) (internal quotations omitted).

[29] *Id.*

[30] *See United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016) ("To the extent that the evidence could have supported a finding of either good faith or intent to defraud, we are not free to second-guess the jury's choice of one view of the evidence over another.").

[31] Having been arrested in the sting operation, Joel clearly knew that some sort of criminal proceeding was in the offing by the time he visited Mario Gonzales.

No. 20-40040

an official proceeding when he tampers with a witness,[32] but there is no requirement that the defendant foresee the nature of the authority initiating that proceeding, as the text of § 1512 makes plain:

> In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance--
>
> (1) that the official proceeding before a judge, court, magistrate judge, grand jury, or Government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency[.][33]

Thus, it is irrelevant whether Joel had the prescience to anticipate that he would face federal, not state, criminal charges following his arrest.

## III.

We AFFIRM Joel Vargas's convictions for transporting stolen goods, conspiracy, and witness tampering. We also AFFIRM Angelica Vargas's conviction for conspiracy to transport stolen goods.

---

[32] *See United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021).

[33] 18 U.S.C. § 1512(g).