# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2024

Lyle W. Cayce
Clerk

No. 23-40144

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Chad Michael Rider,

*Defendant—Appellant*.

————————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:20-CR-232-2

————————————————————————

Before Higginbotham, Smith, and Higginson, *Circuit Judges*.
Patrick E. Higginbotham, Circuit Judge:

Chad Michael Rider was convicted of three counts of producing or attempting to produce child pornography in violation of 18 U.S.C. § 2251(a) and was sentenced to 720 months' imprisonment. He now appeals the jury's verdict and raises five issues on appeal. We AFFIRM.

No. 23-40144

## I.

## A.

In 2019 and 2020, law enforcement learned that two IP addresses associated with the Denison Church of the Nazarene and its pastor, David Pettigrew, uploaded images of child pornography online. After acquiring search warrants for Denison Church and Pettigrew's home, officers found a Maxtor hard drive in Pettigrew's office at the church. The hard drive contained "dozens and dozens of videos" that "captured children, in various stages of undress, taking baths in the church offices." The footage also captured Pettigrew and another man "setting up cameras before the children came in, escorting them in, instructing them how to bathe in front of the cameras so the cameras would capture them, and then taking the cameras down." The church treasurer identified the second man as Appellant Chad Michael Rider.[1]

Two weeks later, officers executed a search warrant at Rider's residence. After locating Rider, Detective Joseph Adcock and Agent Bruce Donnet escorted Rider to a police car to speak with him. Rider was read his *Miranda* rights and admitted to placing cameras at Pettigrew's request on two occasions. Rider claimed he felt "forced" to set up the cameras because Pettigrew had obtained nude photos of Rider's wife, Pettigrew "was [his] pastor," and because Rider "believed there was nothing malicious—nothing sexual about it." Throughout the conversation, Rider maintained that he did not know Pettigrew intended to film the children naked and believed the equipment captured only audio. Rider was arrested later that day.

---

[1] According to Special Agent Mitchell, these videos captured images of Rider's face and Pettigrew was also heard calling him "Michael."

The police later discovered additional videos on the Maxtor hard drive that were filmed at different locations. These included the so-called "Neighbor Videos" and "Home Bathroom Videos." The Neighbor Videos were filmed at Rider's neighbor's house and consisted of three consecutive recordings of Rider's teenage neighbor ("Victim 1") using the restroom. The footage captured Victim 1 "entering her private home bathroom and looking at herself in the mirror; standing up from the toilet while nude from the waist down; and washing her hands prior to leaving the bathroom."[2] The video included footage of Victim 1's genitals. The Home Bathroom Videos were filmed in Rider's home, took place over several days, and captured a different minor ("Victim 2"). Victim 2 was friends with Rider's children, and Rider was Victim 2's legal guardian when he filmed her. The Home Bathroom Videos captured Victim 2 on multiple occasions as she "undresses, examines her body, enters the shower, exits the shower, uses a towel to dry off all of her body, and dresses."

Rider was indicted on three counts of violating 18 U.S.C. § 2251 (a) and (e), which prohibit the sexual exploitation of minors, or attempted exploitation of children, to produce child pornography.[3] Section 2251(a) provides that:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or

---

[2] The three videos were shown to the jury and trial testimony described their content.

[3] Rider was first indicted on August 19, 2020 on one count of violating 18 U.S.C. §2251(a) and (e) related to the Church Videos. On July 13, 2022, the Government returned a superseding indictment that included the counts related to the Neighbor and Home Bathroom Videos.

Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e) . . .[4]

"[S]exually explicit conduct" includes the "lascivious exhibition of the anus, genitals, or pubic area of any person,"[5] which the Fifth Circuit defines as "a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer."[6]

All three counts were based on footage discovered on the Maxtor hard drive. Count One accused Rider and Pettigrew of conspiring or attempting to conspire to employ youth at the Denison Church to engage in sexually explicit activity for the purpose of producing a visual depiction of such conduct. Counts Two and Three related to the Neighbor Videos and the Home Bathroom Videos, respectively, and alleged that Rider "did and did attempt to" use Victims 1 and 2 to produce child pornography. Counts Two and Three read:

Between [the specified dates] in the Eastern District of Texas, Chad Michael Rider, defendant, *did and did attempt* to employ, use, persuade, induce, entice, and coerce any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, and [1] such visual depiction was transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce; [2] that such visual

---

[4] 18 U.S.C. § 2251(a).

[5] 18 U.S.C. § 2256(2)(A)(v).

[6] *United States v. Steen*, 634 F.3d 822, 828 (5th Cir. 2011) (quoting *United States v. Grimes*, 244 F.3d 375, 381 (5th Cir. 2001)).

depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer; and that [3] the defendant knew and had reason to know that the visual depiction would be transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

Specifically, the defendant, Chad Michael Rider, did employ, use, persuade, induce, entice, and coerce Victim [1 or 2], a minor known to the Grand Jury, and did attempt to employ, use, persuade, induce, entice, and coerce Victim [1 or 2], to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, using a concealed recording device and the internet.[7]

## B.

### 1.

Before trial, Rider moved to suppress his conversation with Detective Adcock and Agent Donnet on the basis that his statements were involuntary. He argued that the officers violated his Fifth Amendment right against self-incrimination by failing to secure the voluntary waiver of his *Miranda* rights and by disregarding his request for counsel. Rider also claimed the officers violated his due process rights under the Fourteenth Amendment because Donnet "repeatedly preyed upon [Rider's] substantial faith" to coerce Rider into confessing.

After holding a hearing, the magistrate judge recommended rejecting Rider's Fifth Amendment claim because he was not in a "custodial interrogation." Alternatively, the magistrate judge found that Rider received

---

[7] Counts Two and Three were substantively identical and differed insofar as the counts had different date ranges and Count Two referred to Victim 1 while Count Three referred to Victim 2.

his *Miranda* warnings, implicitly waived his rights by voluntarily speaking with the officers, and did not invoke his right to counsel. The district court overruled Rider's objections and accepted the magistrate judge's report and recommendations on the day of the trial.

**2.**

Rider sought to use Dr. Kristi Compton, a licensed psychologist, as an expert witness at trial. Dr. Compton had conducted a "pedophilia assessment" and planned to provide her expert opinion that Rider "shows no signs of pedophilia" and "that [Rider's] personality leads him to be compliant and conflict avoidant, possibly to the point of being in denial about other's intentions." The Government moved to exclude Dr. Compton's testimony.

After holding a pretrial conference, the district court excluded Dr. Compton's testimony pursuant to Federal Rules of Evidence 401, 403, and 702.[8] The district court found the testimony irrelevant because whether "Rider has the characteristics of a pedophile or a particularly compliant personality that may have motivated him to act is simply not relevant to any element of § 2251 that the Government must prove." The court further determined that, even if Dr. Compton's testimony had some probative value, that value was substantially outweighed by the risk that "the jury may give the testimony undue consideration simply because it comes from an expert." Finally, to the extent that Dr. Compton would testify "solely on Rider's capacity and character to form the requisite intent," the court found the jury could determine this information without need for expert testimony.

---

[8] FED. R. EVID. 401; FED. R. EVID. 403; FED. R. EVID. 702.

**3.**

The Government introduced, *inter alia*, the following evidence at trial: (1) the "Church Videos" taken of children at Denison Church; (2) the Neighbor Videos; (3) the Home Bathroom Videos; (4) testimony by the children depicted in the Church Videos, the Neighbor Videos, and the Home Bathroom videos; and (5) receipts and records from Amazon.com showing that Rider and Pettigrew purchased thousands of dollars of hidden cameras and had them shipped to various addresses, including Rider's home and rental properties.

Rider took the stand, testified in his defense, and advanced two defenses relevant here. First, he testified to his belief that Pettigrew merely wanted to create funny, candid moments for a video montage. Second, Rider claimed he was pressured into helping Pettigrew either because of Pettigrew's role as his pastor or because Pettigrew had nude photos of Rider's wife.

**4.**

The jurors were instructed that they could convict Rider of violating or attempting to violate 18 U.S.C. § 2251.[9] Relevant on appeal, the jury charge for Counts Two and Three read:

> For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following elements beyond a reasonable doubt:
>
> First: That the Defendant did or did attempt to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct;

---

[9] 18 U.S.C. §2251(a), (e).

No. 23-40144

Second: That the Defendant acted for the purpose of producing a visual depiction of such conduct; and

Third: That the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

The jury charge for attempting to commit Counts Two and Three read:

The Government can prove Count [Two or Three] by showing beyond a reasonable doubt that the Defendant did or did "attempt" to commit the offense. It is a crime for anyone to attempt to commit a violation of certain specified laws of the United States. For you to find the Defendant guilty of attempting to commit the sexual exploitation of children a/k/a child pornography, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

(1) That the Defendant intended to commit the sexual exploitation of children a/k/a production of child pornography; and

(2) That the Defendant did an act that constitutes a substantial step towards the commission of that crime and that strongly corroborates the Defendant's criminal intent and amounts to more than mere preparation.

The jury issued a general verdict convicting Rider on all three counts.[10] The verdict form did not reflect whether Rider was convicted on Counts Two and Three for the completed or inchoate offense.

---

[10] For all three counts, the verdict form asked the jury to mark "guilty" or "not guilty" as to the offense charged.

No. 23-40144

**5.**

The Presentence Report ("PSR") recommended a sentencing range of 324–360 months.[11] After considering the factors provided in 18 U.S.C. § 3353, the district court found that an upward variance was warranted and sentenced Rider to 720 months' imprisonment.

In explaining its sentence, the district court noted that the "facts of this case [were] uniquely disturbing" because Rider "used his position of a trusted adult and a church leader to gain unfettered access to the children and church properties for the purpose of producing child pornography," and he had "preyed on children in the community that necessarily didn't attend [church] with their families." The court further explained that Rider took "extraordinary steps" to effectuate his plan, including spending large amounts of money on cameras, creating an alias, shipping the cameras to multiple addresses, and devising "multiple church events which would cause certain children to get wet or dirty, necessitating them having to change clothes." Moreover, Rider had "tested the cameras and adjusted them before and after the events in order to obtain the most optimal angles to record the children naked." The court concluded the Sentencing Guidelines did not account for these factors, Rider's "complete lack" of remorse, or the fact that he shared the footage with Pettigrew. Finally, the district court agreed with the "[G]overnment that ordering the counts to be served concurrently would deprive the victims of justice for the specific crimes committed against them."

---

[11] Rider's total offense level was calculated at 41 with a criminal history category of I, leading to an initial guidelines range of 324–405 months. Because 18 U.S.C. § 2251(e) authorizes a maximum imprisonment of 30 years, the guidelines range was adjusted to 324–360 months.

9

**6.**

Rider raises five issues on appeal. First, he argues the district court erred by denying the motion to suppress his conversation with Detective Adcock and Agent Donnet. Second, he asserts that Dr. Compton's testimony was relevant and should not have been excluded. Third, Rider claims there was insufficient evidence to support his convictions on Counts Two and Three. Fourth, he asserts that the jury charges on Counts Two and Three constructively amended the indictment and allowed the jury to convict on a factual basis not alleged in the indictment. Finally, Rider argues that his sentence was unreasonable.

**III.**

**A.**

Rider argues that Detective Adcock and Agent Donnet violated his Fifth and Fourteenth Amendment rights and that the district court erred by not excluding any inculpatory statements made to the officers. Specifically, Rider claims his statements were involuntary and that the officers manipulated him into believing he could reunite with his family if he cooperated. He also contends Donnet violated his due process rights by referencing their shared Christian faith, which exploited the "human need to disclose" one's "flawed acts or thoughts."

"Where a district court has denied a motion to suppress evidence, we review its factual findings for clear error and its conclusions of law de novo."[12] Factual findings are clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been

---

[12] *United States v. Lim*, 897 F.3d 673, 685 (5th Cir. 2018) (citing *United States v. Ortiz*, 781 F.3d 221, 226 (5th Cir. 2015)); *United States v. Roper*, 63 F.4th 473, 475–76 (5th Cir. 2023).

No. 23-40144

committed.[13] This Court must "uphold the district court's ruling if there is any reasonable view of the evidence to support it."[14]

**1.**

The Fifth Amendment forbids law enforcement from using statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[15] In *Miranda*, the Supreme Court held that law enforcement officials "must inform a suspect in custody of his right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to retained or appointed counsel."[16]

Thus, the threshold question is whether a suspect was "in custody,"[17] an issue that Rider did not address in his appellate briefing. Even if Rider did not abandon this argument on appeal by failing to contest this point, his arguments regarding the waiver of his rights are relevant only if he was in custody. Because we agree with the district court that Rider was not "in

---

[13] *Roper*, 63 F.4th at 475.

[14] *United States v. Shows Urquidi*, 71 F.4th 357, 367 (5th Cir. 2023) (quotation and citation omitted), *cert. denied sub nom. Iglesias-Villegas v. United States*, 144 S. Ct. 268 (2023).

[15] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[16] *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006) (citing *Miranda*, 384 U.S. at 444). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way . . . *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (citation omitted).

[17] *Lim*, 897 F.3d at 690 ("'*Miranda* warnings must be administered prior to 'custodial interrogation.'") (citing *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc)).

custody" when he made the inculpatory statements, we do reach the waiver of those rights.

A suspect is "in custody" when they are "'placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'"[18] In Rider's case, "there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way."[19] Although the conversation lasted for over one and a half hours, Rider was interviewed in an unlocked police car and his counsel admitted at oral argument that Rider was free to leave the police vehicle. Furthermore, Rider was made comfortable and kept "in view of his family members" throughout the conversation. The magistrate judge described the interaction as "conversational" and, at one point and without objection from Adcock or Donnet, Rider opened the car door and asked officers to be careful about searching his truck so as not to scratch the hitch. Under these facts, we see no error in the district court's determination that a reasonable person "would not have understood the situation to constitute a restraint on freedom of movement equivalent to formal arrest."[20] Therefore, Rider was not "in custody" and the district

---

[18] *Courtney*, 463 F.3d at 337 (citing *Bengivenga*, 845 F.2d at 596).

[19] *Mathiason*, 429 U.S. at 495.

[20] *United States v. Gonzalez*, 814 F. App'x 838, 843–45 (5th Cir. 2020) (defendant not "in custody" when he sat in front seat, was interviewed on his property within 40 feet of his home, and could see his family); *United States v. Wright*, 777 F.3d 769 773–77 (5th Cir. 2015) (defendant not "in custody" when he was told he was "free to leave," was not physically restrained, interrogation "took place close to the home, in a car subject to public scrutiny," and transcript "highlights that the conversation was as much an opportunity taken by Wright to tell his story to the officers as it was an opportunity taken by the officers to get information from Wright").

No. 23-40144

court correctly determined there was no violation of his Fifth Amendment rights.[21]

**2.**

Nor was Rider subject to the type of coercion prohibited by the Fourteenth Amendment. As set out in *Chavez v. Martinez*, the Fourteenth Amendment protects a suspect's right to be free from coercive questioning and prohibits "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' [and] violate the Due Process Clause."[22] To violate the Due Process Clause, law enforcement must use a "substantial element of coercive" conduct that is "intended to injure in some way unjustifiable by any government interest."[23] This demanding standard applies to "police torture or other abuse."[24]

---

[21] Even if Rider was "in custody," we agree that the officers issued his *Miranda* rights and that Rider either waived or failed to invoke his rights.

[22] *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (citation omitted); *Edmonds v. Oktibbeha Cnty., Miss.*, 675 F.3d 911, 916 (5th Cir. 2012); *Nenno v. Quarterman*, 489 F.3d 214, 217 (5th Cir. 2007) ("It is true, as Nenno argues, that a confession might in some circumstances be coerced from a person not in custody. But the question then is one of fundamental fairness under the due process clause.").

[23] *Colorado v. Connelly*, 479 U.S. 157, 163–64 (1986) ("While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct."); *Chavez*, 538 U.S. at 775 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

[24] *Chavez*, 538 U.S. at 773; *id.* at 794 (Kennedy, J., concurring in part and dissenting in part) (citing *Brown v. Mississippi*, 297 U.S. 278 (1936) for the proposition that the Due Process Clause, not the Self-Incrimination Clause, prohibits convictions based upon "tortured confessions"); *see also Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 868 (5th Cir. 2012) ("As one court has recently summarized, '[t]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even

No. 23-40144

Although Rider was interviewed in a police vehicle, the car was not locked and was kept at a comfortable temperature. His counsel admitted he could exit the vehicle at any time. Rider's health and safety was not threatened, nor was he verbally threatened.[25] To the contrary, the record indicates the interaction remained "conversational." Even if Rider is correct that Donnet "manipulated [Rider's] faith to suggest forgiveness from God if [Rider] confessed," the Supreme Court has held that appeals to the conscience do not constitute coercive police tactics.[26] Simply put, Rider can point to no behavior that violates the "decencies of civilized conduct"[27] and

---

violations resulting from bad faith to something more egregious and more extreme.'") (citing *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)).

[25] *Rochin v. California*, 342 U.S. 165, 172 (1952) (concluding that "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents" do "more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically"); *Jackson v. Harris*, 446 F. App'x 668, 670 (5th Cir. 2011) ("Regarding Jackson's contention that Harris acted coercively, mere verbal abuse, threatening language, and gestures do not amount to a constitutional violation.") (citing *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993)); *see Keys*, 675 F.3d at 867–68 (collecting cases to support statement that "many cases that have applied the [shocks the conscience] standard have involved the use of extreme force by police officers or other state actors").

[26] *Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985) ("The Fifth Amendment, of course, is not concerned with . . . moral and psychological pressures to confess emanating from sources other than official coercion.") (citation omitted); *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) ("The fact that Helgert's question referred to Thompkins' religious beliefs also did not render Thompkins' statement involuntary. The Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion.") (cleaned up) (citation and quotations omitted). Although *Elstad* and *Berghuis* concern the Fifth Amendment, *Chavez* teaches that the Fourteenth Amendment standard is higher, and we see no reason why appeals to religion would be permissible under the Fifth Amendment but impermissible under the Fourteenth Amendment.

[27] *Rochin*, 342 U.S. at 173.

meets *Chavez*'s high standard.[28] The district court did not err in denying Rider's motion to suppress on this basis.

**B.**

The district court excluded Dr. Compton's testimony pursuant to Federal Rules of Evidence 401, 403, and 702.[29] Rider contends that this was error. We disagree and uphold the district court's exclusion under Rule 403.

Evidentiary rulings are reviewed for an abuse of discretion, subject to harmless-error analysis.[30] Determinations under Rule 403 are given "'an especially high level of deference'" and reversal is "called for only 'rarely' and only when there has been 'a clear abuse of discretion,'"[31] i.e., a complete disregard of the controlling law.[32]

Rule 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed" by a danger of confusing the issues or misleading the jury.[33] Here, the district court believed Dr. Compton's testimony "present[ed] a risk that the jury may give the testimony undue consideration simply because it [came] from an expert" and

---

[28] Rider analogizes his situation to that of *United States v. Adair*, No. 4:16-CR-527, 2018 WL 322228 (S.D. Tex. Jan. 8, 2018), to support his argument that his statements were involuntary. Although *Adair* presents similar facts as this case, the district court did not apply *Chavez*'s "shock the conscience" standard. *Chavez*, 538 U.S. at 774 (citation omitted). As such, Rider misplaces his reliance on *Adair*.

[29] FED. R. EVID. 401; FED. R. EVID. 403; FED. R. EVID. 702.

[30] *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011) (citation omitted).

[31] *United States v. Dillon*, 532 F.3d 379, 387 (5th Cir. 2008) (quoting *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007)).

[32] *United States v. Naidoo*, 995 F.3d 367, 375 (5th Cir. 2021) (citation and quotation omitted).

[33] FED. R. EVID. 403.

that this risk outweighed its "limited" probative value. Although Rider argues the court erred by "reason[ing] from the general to the specific," he has not shown how this error "amounts to a complete disregard of the controlling law."[34] To the contrary, this circuit has previously affirmed decisions to exclude expert testimony regarding a defendant's sexuality in child pornography cases.[35] Rider makes no attempt to explain why his case is different.

Therefore, we find that the district court did not abuse its discretion by excluding the testimony pursuant to Rule 403. Because we find that the district court did not err on this basis, we need not address Rider's arguments regarding Rules 401 and 702.

## C.

Rider next argues that there was insufficient evidence to support Counts Two and Three of the indictment. The indictment on Counts Two and Three set out two theories of criminal behavior: first, that Rider sexually exploited Victims 1 and 2, and second, that he attempted to exploit Victims 1 and 2. The jury were instructed on both the completed and inchoate offense and returned a general verdict finding Rider guilty.[36] As to the completed offense, the parties now dispute whether Rider's videos portrayed a "lascivious display of the genitals."[37] As to the inchoate offense, Rider

---

[34] *Naidoo*, 995 F.3d at 375.

[35] *See generally id.* at 375–76 (holding that district court did not err in excluding expert testimony regarding defendant's sexuality in 18 U.S.C. § 2252 possession case).

[36] The jury was told that the Government did "not have to prove both of these for you to return a guilty verdict" so long as the verdict was unanimous. The Government provided proposed jury instructions, including a general verdict form. Rider filed several objections and requested amendments but did not object to the general verdict form.

[37] The parties' arguments focus on the six *Dost* factors, which this Circuit allows juries to consider when deciding whether an image is lascivious. *See Steen*, 634 F.3d at 826–

No. 23-40144

admits "the attempt charge is the hardest for him," but argues there was insufficient evidence of attempt because "the cameras were set up so that they would be unlikely to focus on the female-sexual organ or pubic area."

"In determining whether there was sufficient evidence to sustain [the] convictions, we must decide, viewing the evidence and the inferences [] in the light most favorable to the verdict, whether a rational juror could have found [the defendant] guilty beyond a reasonable doubt."[38] "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."[39] Because of the general verdict, we cannot determine whether the jury convicted on the completed offense theory, the attempt theory, or both. Regardless, when cases are submitted on two alternative, legally valid theories, this Court must affirm if either theory is supported by sufficient evidence.[40] The Court finds

---

27; *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), *and aff'd*, 813 F.2d 1231 (9th Cir. 1987). Relevant here, the sixth Dost factor asks "[w]hether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Dost*, 636 F. Supp. at 832. Rider argues there was no evidence that he intended his footage to elicit a sexual response in the viewer, and that like the defendant in *United States v. Steen*, "merely being a voyeur excited" him. The Government disagrees and contends that Rider's extensive preparation and dissemination of the recordings to Pettigrew demonstrated his intent to capture sexually explicit material.

[38] *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007) (citations omitted).

[39] *Id.*

*Griffin v. United States*, 502 U.S. 46, 49 (1991); *Sochor v. Fla.*, 504 U.S. 527, 538 (1992); *United States v. Powers*, 168 F.3d 741, 753–54 (5th Cir. 1999) ("As already mentioned, the case was submitted to the jury on two alternative, legally valid theories. If either theory was supported by sufficient evidence, we are bound to affirm."); *United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010) ("If the evidence was sufficient to support one theory, the fact that the evidence was insufficient to support another of the theories does not negate the verdict.").

that sufficient evidence supports Rider's conviction for attempting to produce child pornography.

It is a violation of 18 U.S.C. § 2251(e) to attempt to employ, use, persuade, induce, entice, or coerce any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct.[41] Attempts require proof of two elements: "first, that the defendant acted with the kind of culpability otherwise required for the commission of the underlying substantive offense, and, second, that the defendant had engaged in conduct which constitutes a substantial step toward commission of the crime."[42] Thus, the conviction may be upheld so long as sufficient evidence indicates Rider acted with specific intent to film Victims 1 and 2 engaging in sexually explicit conduct and took a substantial step towards doing do.

There is ample evidence that Rider had the intent and took the necessary steps towards accomplishing his aim. A rational jury could have gleaned Rider's intent from his extensive planning and efforts to hide his behavior. For example, Rider spent thousands of dollars purchasing recording equipment and specifically selected discreet cameras. He bought cameras disguised as household items, such as a clock, a pen, and hooks,[43]

---

[41] 18 U.S.C. § 2251(a), (e).

[42] *United States v. Farner*, 251 F.3d 510, 513 (5th Cir. 2001) (citation omitted).

[43] The purchases were made using a false name, with an email address created on Rider's phone, and shipped to properties owned, in part, by Rider. Some orders were shipped to Rider's parents' home. Generally, individuals do not use an alias to purchase hidden cameras if they intend to document others for clinical, scientific, or artistic purposes. The premediated nature of his conduct strongly supports that he was no opportunistic voyeur, unlike the defendant in *Steen. See Steen*, 634 F.3d at 827 n.23 (noting "[t]he voyeuristic nature of the offense limits his ability to control the location and poses.").

and then placed these cameras in locations where their presence would seem innocuous. Furthermore, he selected locations where his victims would expect privacy and, for various reasons, were sure to expose their genitals. Rider positioned and angled his cameras to capture his victims' pubic areas. The camera used in the Neighbor Videos was angled to capture Victim 1's midsection and recorded her urinating and standing in her underwear. Rider likewise placed cameras to capture Victim 2's pubic area, including one camera inside the bath directly above the knob to turn on the water, i.e., at a height designed to capture her breasts and pubic area. Finally, there is evidence that Rider made a concerted effort to record Victim 2 in particular. Victim 2 testified that Rider would frequently "stop[] her" before she went into the bathroom so that could "fix something real quick or make it up for me." Footage later recorded Rider turning on the cameras before Victim 2 entered the bathroom. When she asked Rider about the "flickering light" she noticed, he told her "it was nothing to worry about, that they had always been there."

Nevertheless, Rider contends that he did not attempt to film explicit content. He claims such an attempt would have required the "cameras [] to be placed differently," such as "placed facing a person who sat on the commode" or "set up to take a 'zoomed' in image of someone getting into or out of the shower." Rider essentially argues that had he intended to film explicit material, he would have placed his cameras differently and tried harder to zoom in on his victims' genitals. This argument is unpersuasive and ignores the fact that his cameras *were* angled and positioned to capture his victims' genitals. Additionally, criminal attempts take a myriad of forms, and this Court will not hamstring § 2251(e) when defendants fail to perfectly execute their plans. As the Eighth Circuit noted in *United States v. Johnson*,

"[a] defendant's success in attaining his criminal objective is not necessary for an attempt conviction."[44]

Taking the evidence in the light most favorable to the Government, Rider expended significant funds to acquire discreet recording equipment and set up these devices in areas where Victims 1 and 2 were guaranteed to display their public areas. Given the expectation of privacy that accompanies bathrooms and showers, a rational juror could have found that Rider hoped and intended to capture a lascivious display of the victims' genitals. A jury could use the same evidence to conclude that Rider took substantial steps to record this explicit footage. In short, substantial evidence supports the jury verdict.

**D.**

Rider asks this Court to overturn his conviction on the basis that the jury charge constructively amended the first superseding indictment. The indictment for Counts Two and Three listed the elements of the offense and alleged that Rider engaged in the prohibited conduct "using a concealed recording device and the internet." The jury charge likewise enumerated the elements of the offense but did not include language regarding a "concealed recording device and the internet." Rider claims that this omission constitutes reversible error.

---

[44] *United States v. Johnson*, 639 F.3d 433, 439 (8th Cir. 2011) (citation omitted); *see also United States v. Moran*, 57 F.4th 977, 981 (11th Cir. 2023), *cert. denied*, No. 22-7847, 2023 WL 8007353 (U.S. Nov. 20, 2023) ("Using the Supreme Court's terminology, Moran could have 'consciously desired'—and thus intended—to produce child pornography, however remote the 'likelihood of that result happening.'") (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).

No. 23-40144

We review constructive amendment claims de novo and convictions must be overturned if a constructive amendment has occurred.[45] Because Rider raises this argument for the first time on appeal, it is reviewed for plain error.[46] "A constructive amendment occurs . . . when the Government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment."[47] Phrased differently, constructive amendments occur when the government "convict[s] the defendant on a materially different theory or set of facts than that with which she was charged."[48]

We find no constructive amendment occurred. Although the language regarding a "concealed recording device and the internet" was omitted from the jury charge, the Government introduced plenty of evidence that Rider purchased and used concealed recording devices—including hidden camera alarm clocks, cameras disguised as hooks, a "super small hidden spy camera," pens with cameras, camera adapters, and camera smoke detectors—to film his victims. Thus, the Government provided evidence that Rider used "a concealed recording device." The Government also offered evidence that Rider purchased these cameras through Amazon.com and that they were shipped "in and affecting" interstate commerce, satisfying the indictment's language regarding use of the internet.

---

[45] *United States v. Lockhart*, 844 F.3d 501, 514 (5th Cir. 2016) (citation omitted).

[46] *United States v. Vargas*, 6 F.4th 616, 621 (5th Cir. 2021) (citing *United States v. Stanford*, 805 F.3d 557, 566 (5th Cir. 2015); *Lockhart*, 844 F.3d at 514 ("When the indictment alleges a particular set of facts as forming the basis for the defendant's violation of a statute, but the trial court allows evidence of other facts not alleged in the indictment to form the basis of the jury's guilty verdict, this court finds a constructive amendment.").

[47] *Vargas*, 6 F.4th at 621.

[48] *United States v. Thompson*, 647 F.3d 180, 184 (5th Cir. 2011) (citation omitted).

No. 23-40144

Accordingly, "the government did not maintain two alternative theories—only one of which was charged—and urge the jury to convict upon either of them. Rather, the government presented a single, consistent theory of conviction throughout."[49] Because the evidence presented and relied upon for conviction was that alleged in the indictment, there was no constructive amendment.

## E.

Finally, Rider claims that his 720-month sentence is substantively unreasonable. We disagree.

This Court generally reviews a sentence for unreasonableness but decisions to depart from the Guideline range and the extent of the departure are reviewed for an abuse of discretion.[50]

Rider argues that the district court "failed to account for Pettigrew's control of this production scheme" and Rider's diminished culpability given that he "had less responsibility" than Pettigrew at the church. Rider asserts that Pettigrew's sentence "should have been a benchmark" and "there is no basis for [Rider] to have a sentence double that of Pettigrew." Rider

---

[49] *Thompson*, 647 F.3d 180, 186 (5th Cir. 2011); *see also Stirone v. United States*, 361 U.S. 212 (1960) (indictment alleged a defendant used his position to "unlawfully obstruct, delay [and] affect interstate commerce ... and movement of [sand] by extortion" but jury charge was allowed to convict if conduct affected interstate commerce as to sand *or* affected interstate commerce as to steel shipments); *Lockhart*, 844 F.3d at 515–16 (finding constructive amendment after "district court materially modified an essential element of the indictment by transforming the offense with which the indictment charged McCullouch from one requiring a specific mens rea into a strict liability offense"); *United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005) (finding essential element of 18 U.S.C. § 922(g)(1) was possession of ammunition and constructive amendment occurred when indictment alleged knowing possession of "104 rounds of .40 caliber S&W jacketed hollow-point ammunition" but government only put on evidence of bullets and primers).

[50] *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006).

essentially asked the district court to ignore his conduct and transfer responsibility wholly onto Pettigrew. The district court's refusal to do so did not constitute an abuse of discretion.

When considering Rider's sentence, the district court adopted the PSR's factual findings and guideline applications and then looked to the factors set out in 18 U.S.C. § 3553(a) to determine whether the sentence should deviate from the advisory range.[51] After considering these factors, the district court determined "an upward variance [was] warranted" because of the "uniquely disturbing" facts of the case and its belief that the "guidelines do not account for . . . the level of depravity exhibited by the defendant in this case." The district court justified its upward variance because of Rider's "complete lack of remorse" or acceptance of responsibility, position as church leader, predation upon vulnerable children, and the "extraordinary" steps taken to conceal his conduct. To "protect the community and . . . provide adequate punishment" the district court imposed the maximum punishment.

These considerations directly responded to Rider's belief that he was not culpable in the "production scheme." Indeed, at sentencing, the district court highlighted Rider's behavior and explained exactly why it found Rider culpable. The district court explained that Rider held a "position of a trusted adult and church leader" and described how he used this position to "gain unfettered access to the children and church properties," orchestrated church events designed to get children dirty, and "encouraged the children to disrobe and then bathe in the room." The district court observed how Rider "made the children feel safe by ensuring that the doors were locked for

---

[51] The PSR calculated that the advisory guidelines range was 324–360 months' imprisonment and Rider does not object to this calculation.

their privacy and comfort" and then abused their trust by "secretly filming them naked." The district court further referenced Rider's comments regarding "bus kids,"[52] found that Rider preyed "upon children who didn't necessarily have [] parental supervision," and "sometimes singled out certain children for special events during which he would then record them naked at the church." Not only did Rider exhibit "extreme conduct" but he "took extraordinary steps" to cover his behavior. In sum, we agree with the Government that "the district court made clear that it considered Rider's argument that he was less culpable than Pettigrew and rejected it." And given the district court's thorough reasoning on this point, we cannot say that the district court erred in doing so.

Rider is incorrect that this sentence is unreasonable in light of Pettigrew's sentence because Pettigrew does not provide an appropriate benchmark. While 18 U.S.C. § 3553(a)(6) encourages district courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" in imposing sentences, district courts need not avoid sentencing disparities between co-defendants who are not similarly situated.[53] Here, Pettigrew pled guilty to a single offense whereas Rider was convicted by a jury of *three* counts; Rider's additional offenses involved two additional victims, "different locations," "different dates," and "different . . . kind[s] of secret

---

[52] During his conversation with Adcock and Donnet, Rider referred to the "bus kids" as children in the community who "cause[d] a lot of trouble" in the community but whose parents did not attend Denison Church.

[53] 18 U.S.C. § 3553(a)(6); *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010) ("However, this disparity factor requires the district court to avoid only unwarranted disparities between similarly situated defendants nationwide, and it does not require the district court to avoid sentencing disparities between co-defendants who might not be similarly situated.") (citation omitted).

filming."[54] Rider and Pettigrew are not similarly situated and the difference between their sentences is permissible.

The district court properly calculated the applicable guidelines range and articulated legitimate reasons for an upward departure. The district court's explanation and findings in support of that departure demonstrate that the sentence is substantively reasonable.

## IV.

In conclusion, the district court did not err by denying Rider's motion to suppress nor by excluding Dr. Compton's testimony. We conclude that the jury charge did not constructively amend the first superseding indictment and the jury verdicts were supported by sufficient evidence. Finally, Rider's sentence is not substantively unreasonable. We therefore AFFIRM.

---

[54] *See also United States v. Cisneros-Gutierrez*, 517 F.3d 751, 767 (5th Cir. 2008) (finding two defendants not "similarly situated" when one, *inter alia*, "pled guilty [and] provided information to law enforcement authorities").